Filed 4/26/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S090499 |
| v. | ) | |
| | ) | |
| DAVID JAMES LIVINGSTON, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. TA 100812 |
| _____ | ) | |

A jury convicted defendant David James Livingston of the first degree murders of Roderico Armando Paz and Remigio Perez Malinao under the special circumstances of multiple murder and lying in wait, of three counts of premeditated attempted murder, and of possession of a firearm by a felon. As to the murder and attempted murder counts, the jury found true firearm and criminal-street-gang-enhancement allegations. As to the attempted murder counts, the jury also found true that defendant personally inflicted great bodily injury. (Pen. Code, §§ 186.22, subd. (b)(1), 187, 190.2, subd. (a)(3), 190.2, former subd. (a)(15), 664, 12021, subd. (a)(1), 12022.53, subds. (b), (c), 12022.7, subd. (a).)[1]

After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict. (§ 190.4.) It sentenced defendant to

_____

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

death on the murder counts.  Additionally, it sentenced him to state prison on the other counts but stayed that sentence under section 654.  This appeal is automatic. (§ 1239, subd. (b).)  We affirm the judgment.

## I.  THE FACTS

### A.  Guilt Phase

The murder and attempted murder charges arose out of two separate incidents.  On October 8, 1998, defendant shot Emmanuel Nunley, a rival gang member.[2]  For this incident, defendant was convicted of one count of attempted murder.  On January 3, 1999, defendant shot and killed two security guards, Paz and Malinao, and shot and attempted to kill two other security guards, Saul Conner and Rodolfo Bombarda.  For this incident, defendant was convicted of two counts of first degree murder with special circumstances and the remaining two counts of attempted murder.

#### 1.  Prosecution Evidence

##### a.  October 8, 1998

In the evening of October 8, 1998, three men, Damien Perry, Antwone Hebrard, and Markius Walker, were driving on Compton Boulevard in Compton. Perry was the driver.  Hebrard and Walker were members of a street gang called the "Lueders Park" or "Piru" gang, which was a  "Bloods gang."  Perry testified that Bloods and "Crips" gangs do not get along; there were "fights and shooting" between them.

At some point, Compton police officers stopped the car Perry was driving near Bullis Road.  Perry also noticed a nearby green Cadillac with a "CPT" sticker

---

[2]     Nunley used the alias Emmanuel Hunter, and the information charging defendant with his attempted murder gave his name as Hunter.  Nunley was his real name, so we will use it in this opinion.

in the back window.  Because Perry had no driver's license, the police impounded the car he was driving.  The police refused to give the three who had been in that car a ride, and they had to walk out of the area.

While the three were walking, they encountered Emmanuel Nunley, another Lueders Park gang member, who was near an apartment building on Bullis.  The Cadillac Perry had seen earlier passed by, turned around, and approached the group.  Three people were in that car:  the driver, one person in the front passenger seat, and one person in the back seat.  Defendant, who is White, was in the front passenger seat.  The other two in the car were African-American.  Defendant began shooting at Nunley, hitting him in the left leg.  By this time, Perry, Hebrard, and Walker had walked away and were a substantial distance from Nunley.  Perry heard about seven to eight shots.

Perry testified that "all of us" were wearing red — the color of the Bloods — that night.[3]

After the shooting, the Cadillac entered the New Wilmington Arms, a nearby apartment complex.  Five security guards were on duty at the complex — Charles Chavers, Roderico Armando Paz, Rodolfo Bombarda, Saul Conner, and Juan Arreola.  Chavers testified that around 11:30 p.m. that evening, the Cadillac, which was familiar to him, approached the guard gate.  Three people were in the car; defendant was in the front passenger seat.  Chavers pushed a button to let the car enter the apartment complex, and it drove through.  Soon after the shooting, within about 10 minutes of the Cadillac entering the complex, Compton police

---

[3]    Perry provided this testimony on redirect examination.  It is not entirely clear whether "all of us" meant only the three who had been in Perry's car, or included Nunley, whom the three met while they were walking.  But Perry had previously provided much testimony about their encounter with Nunley and seeing him being shot, so the most likely inference is that "all of us" included all four.

officers arrived at the guard gate asking about the car. Chavers showed the police where the Cadillac had been parked near one of the apartment buildings. The police impounded the Cadillac that evening but did not arrest anyone. The failure to arrest anyone made Chavers feel threatened, because he had pointed the car out to the police. He promptly quit his job and left the site, never to return.

The police found two expended shell casings from an automatic rifle near the site of the shooting. Shortly after the shooting, the police transported the three uninjured witnesses to the Cadillac inside the apartment complex. The three identified the Cadillac as the car involved in the shooting. At trial, Perry said he could identify the car by the sticker in the back and a dent on the passenger side.

Defendant, nicknamed "Goldie," owned the Cadillac involved in the shooting and was often seen driving it. Chavers, the security guard, testified that he had seen defendant many times. Defendant did not live in the apartment complex, but he was there often and often drove the Cadillac past the guard gate. It was unusual for defendant to have been in the Cadillac's front passenger seat the evening of the shooting. He was usually the driver.

Walter Arcia, another security guard at the apartment complex who knew defendant as a regular driver of the Cadillac, testified that the day after the shooting, while he was on patrol in the complex, defendant, driving the Cadillac, "cut [him] off." Defendant said to Arcia, "Where's the fucking cripple?" Arcia believed defendant was referring to Chavers, who had helped the police impound the car. Chavers suffered from cerebral palsy and walked with a noticeable limp. Arcia relayed defendant's statement to Chavers, who perceived it as a threat.

Perry positively identified defendant as the gunman in court and had previously selected his photograph from a lineup. At trial, Hebrard denied having seen either the shooter or defendant that evening. He had previously selected defendant's photograph from a lineup as that of the person who had "shot at us,"

4

but he claimed at trial that he had done so only because the police had told him which photograph to select. The officer who showed Hebrard the photographic lineup denied that he had told Hebrard which photograph to select. Nunley testified at trial that he did not see who shot him. Previously, Nunley had selected the photograph of a Hispanic-appearing person, not defendant, as looking "like the driver without the gold ponytail."

Chavers identified defendant at trial as the one in the Cadillac's front passenger seat that evening and had previously selected his photograph from a lineup. He also identified a photograph of the person who drove the Cadillac that evening from a lineup and, at trial, identified Freddie Sanders as the person in the back seat.[4] Chavers testified that Sanders and the driver lived in the apartment complex. Bombarda, one of the other security guards on duty, also observed the Cadillac, which he knew to be defendant's car, come past the guard gate that evening.

Markius Walker was unavailable to testify at trial. (He had died in an unrelated homicide, a fact the jury did not learn.) Over defense objection, a videotape of a police interview with Walker was played to the jury. Walker told the police he saw the Cadillac, then heard more than seven shots coming from it. He described the shooter as having a tattoo and wearing his hair in a ponytail, and he identified defendant's photograph from a lineup as that of the shooter. He also identified the Cadillac as the car involved in the shooting, and had done so the evening of the shooting.

---

[4] Sanders was a codefendant at the guilt, but not penalty, phase of the trial. He is not involved in this appeal.

5

### b. *January 3, 1999*

Walter Arcia was on duty as a security guard at the New Wilmington Arms the evening of January 2, 1999. Around 8:40 p.m., he observed defendant drive the green Cadillac through the guard gate followed by another vehicle. Both cars had their headlights off, even though it was dark that January night. Neither car had a license plate. The cars drove towards the back. The cars were quiet and there was no beer drinking, which was unusual for defendant, who usually played loud music and drank beer when he drove through the gate. Defendant's car entered and left by the gate about six to seven times that evening. It seemed unusual to Arcia seeing the cars "going slowly in and out." When Arcia's shift ended at 11:00 p.m., he left.

Fourteen-year-old Michelle Lopez and her mother, Maribel, lived at the New Wilmington Arms near the guard shack. The evening of January 2-3, 1999, Michelle was visiting a friend in an upstairs apartment. Around 11:15 p.m., while watching television, she heard "loud screaming outside." She looked out the window and saw defendant's Cadillac, which she had often seen defendant drive. Defendant, whom she had seen often and knew as Goldie, and two Black males whom Michelle did not know, were arguing with a security guard. The driver's door of the Cadillac was open. Defendant was sitting in the passenger seat of the Cadillac and the Black males were standing outside. One of the Black males cursed the guard, saying things like, " 'We're going to get you. We'll get you later.' " The other Black male said something like, " 'Come on, let's go.' " Then he said to someone in the Cadillac, " 'We'll do it later.' " When they finished arguing, they left. Michelle testified the guard did not say anything. She recognized the guard but did not know his name. He was one of those killed later.

Maribel Lopez also heard the arguing. She heard several voices, and heard a "lot of bad words," including, " 'Motherfucker, I'm going to get you.' " She

6

also heard someone say, " 'No. No, man. Not right now.' " Then the argument stopped.

Rodolfo Bombarda, one of the New Wilmington Arms security guards, also knew defendant by sight as a frequent visitor to the apartment complex. He estimated he had seen defendant about 30 times before the night of January 2-3, 1999. That night, he was on duty during the 11:00 p.m.-7:00 a.m. shift. Also on duty were Roderico Paz, Remigio Malinao, and Saul Conner. Between around 11:30 p.m. and 12:20 a.m., Bombarda and Malinao walked around the apartment complex.

Around 5 a.m. that morning, all four security guards were in the security guard shack. Conner and Paz were reading the newspaper and Bombarda and Malinao were conversing. Suddenly, Bombarda heard a voice say, "Motherfucker." He looked up and saw defendant standing in the doorway holding an assault rifle. Defendant started shooting into the shack. Bombarda heard about 15 shots from a semiautomatic weapon. Bombarda was shot six times. He was wearing a bulletproof vest. Three of the shots went into the vest; the other three hit Bombarda's right hip, right knee, and right foot. Bombarda was able to fire back one shot from his firearm, a .45-caliber handgun.

Michelle and Maribel Lopez heard the shots. Maribel called the guard shack and Bombarda asked her to get help. She dialed 911. Maribel looked outside and saw two Black men, one of whom she identified as Freddie Sanders, whom she had seen often at the New Wilmington Arms. The two men were standing, and then they ran away from the guard shack. She did not see defendant that morning.

Kimberly Grant, a resident of the New Wilmington Arms, testified that she and her boyfriend had driven through the front gate that same morning. She observed defendant, whom she had seen many times, park his green Cadillac in

7

front of the car she was in. Freddie Sanders and a girl were also in the car. Grant observed defendant's car enter and leave the complex two or three times. Grant entered her home. About 10 to 20 minutes later, she heard a noise from the front gate that sounded like "click, click." She walked towards the gate and observed what she believed to be a dead man. She saw defendant stand near the shack door and then flee. She also saw Sanders flee in a different direction.

Paz and Malinao were killed. Malinao was shot seven times. Two of the bullets hit the bulletproof vest he was wearing; the other five penetrated different parts of his body. Paz was fatally hit by a single bullet through his mouth and neck. Conner was blinded by a single gunshot to the face.[5]

Bombarda and Grant both selected defendant's photograph from a lineup and identified him at trial. When interviewed at the hospital after the shooting, Bombarda told the police he had seen the perpetrator often, and that he was the same person who had driven by in October and the police were looking for. Bombarda also gave a description of the perpetrator that matched defendant, including a description of his tattoos.

Among the items of evidence collected from the scene of the shooting were about 16 expended nine-millimeter cartridge casings. A firearms examiner testified that with two possible exceptions, all of the casings were fired from the same gun. Due to their condition, he could not tell whether the remaining two casings had been fired from that gun. The nine-millimeter casings bore stamps indicating they were manufactured by Federal Cartridge, a brand of bullet. Numerous bullets and bullet fragments were also found, all of which, with one exception, came from the same gun. The exception was a .45-caliber bullet which

---

[5]     Conner died of a heart attack before trial and did not testify.

was found together with a .45-caliber cartridge casing (presumably the shot that Bombarda managed to fire).

On January 5, 1999, defendant telephoned a friend, Rebecca Radovich, and told her he needed a place to stay. He came to her home in Lancaster, driving a stolen Lexus. He stayed overnight, left for a while, then returned to her home, where he was arrested on January 9, 1999. When arrested, he was wearing a bulletproof vest. Inside a leather jacket belonging to him was a loaded nine-millimeter Beretta semi-automatic pistol and three ammunition clips.

Shantae Johnson, defendant's girlfriend, testified that during the evening of January 2-3, she and defendant went to a club in Los Angeles, arriving sometime after 11:00 p.m., and remained there until around 3:30 to 4:00 a.m. They returned in defendant's car to her home near the New Wilmington Arms apartment complex. The two went inside her home. She "immediately started getting undressed for bed. [She] went to bed, and he was getting undressed for bed." She fell asleep "immediately." She last saw defendant sitting on the bed taking his shoes off. She awoke around 8:00 a.m. Defendant was in bed with her at the time, but she did not know whether he had been there the entire time because she was sleeping.

On January 6, 1999, the police searched Shantae Johnson's home pursuant to a search warrant. In the garage, they found a firearm magazine with a capacity of 31 rounds containing 10 rounds of nine-millimeter ammunition manufactured by Federal Cartridge.

### c. Other Evidence

The parties stipulated that the Park Village Crips is a criminal street gang within the meaning of section 186.22, subdivision (b)(1). Detective Ray Richardson, an expert on criminal street gangs, testified that gangs such as the

9

Park Village Crips are groups "who have come together for a common goal normally to terrorize the public" by criminal behavior, "such as rapes, robberies, murder, drugs . . . those type of activities." He also testified that the Crips and Bloods gangs do not get along with each other. Defendant was a member of the Park Village Crips, its only known White member. He bore numerous tattoos attesting to his membership in the gang. Freddie Sanders and the man who drove the Cadillac at the time of the October 8, 1998, shooting were also members of the gang. The New Wilmington Arms apartment complex was covered with Park Village Crips graffiti.

The parties stipulated that defendant had been a convicted felon on January 3, 1999.

### 2. *Defense Evidence*

Defendant's mother, Judy Gary, testified that he is left-handed, although she had never seen him fire a gun. (The apparent reason for this testimony was that Bombarda had testified that he believed defendant's "left hand was holding the rifle stock, and his right hand was on the trigger.")

Vera Johnson, the mother of defendant's girlfriend Shantae Johnson, testified that in January 1999, she lived with Shantae and other family members. Sometime during the night of January 2, defendant and Shantae left the house. They returned home around 4:00 a.m., the morning of January 3. Vera heard them enter Shantae's bedroom, which was downstairs from her own. Vera woke up around 7:00 a.m. At that time, Shantae and defendant were in bed together. Vera did not hear anyone leave the house in the interim and was confident she would have heard it if someone had done so. She never mentioned this to the police, even when they came to her house on January 6 to execute the search warrant.

10

Defendant testified. He said he was a member of the Park Village Crips, is called "Goldie," has two felony convictions, and owned the Cadillac involved in this case.

On October 8, 1998, he drove the Cadillac during the daytime, but he parked it around 6:00 p.m. A "girlfriend" drove him in her car to her home outside Compton. The girlfriend's name was Rachel; he could not remember her last name. The next day, around noon, Rachel brought him back to Compton, and he discovered that his car was gone. He was told that the police had taken it. He testified he did not blame the security guards for the towing of his car and denied threatening a guard. He did not give anyone permission to drive his car the night of October 8-9 and was not involved in the October 8 shooting.

On January 2, 1999, defendant was "in and out" of the New Wilmington Arms all day until about 9:00 to 9:30 p.m. He was not involved in an argument at the guard shack. Around midnight, he went to a club with Shantae Johnson. They returned to Shantae's home, where they went to sleep and woke up the next morning. He was having car trouble, so he drove a Lexus, which belonged to an acquaintance, Darlene Toa. He had obtained the car key from Toa and assumed the car was stolen. During this time, he heard about the shooting of the security guards. He said he was afraid of the police because in 1994, police had shot him in the back while he was handcuffed. He owned a bulletproof vest because he had had an "under-the-table type job . . . like a driver-security for exotic dancers." He was arrested at Rebecca Radovich's home. He was wearing the bulletproof vest when arrested because he was afraid the police would try to kill him.

Defendant testified that he had nothing to do with the shooting of the security guards. He also denied having seen the handgun found in his jacket. He said that Toa had put it in the jacket when she was wearing it.

11

### 3. Other Evidence

On rebuttal, Detective Richardson testified that on October 21, 1998, defendant had told him he had been with Shantae Johnson at her home on October 8. Defendant testified on surrebuttal that Detective Richardson was mistaken in this regard.

## B. Penalty Phase

### 1. Prosecution Evidence

Relatives of the shooting victims testified about the victims and the impact the shootings had on their families.

Additionally, the prosecution presented evidence that in January 1991, defendant assaulted a man with a knife, for which he was convicted of assault with a deadly weapon. Defendant was also convicted of possession of cocaine in 1993 and second degree robbery in 1994. The prosecution also presented evidence that, on October 8, 1999, defendant stabbed a fellow jail inmate with a razor blade and had previously been involved in several fistfights in prison. (See pt. II.B.1., *post*.)

### 2. Defense Evidence

Several of defendant's relatives and friends testified about his life, his good qualities, and their positive relationship with him. Richard Flennaugh testified that he was shot on January 1, 1999, and would have lost his foot if defendant had not rushed him to the hospital in defendant's car. Santos Fuertez, a parole agent, testified that after he was paroled in 1998, defendant was tested for drugs several times with negative results. Possessing a bulletproof vest was not considered a violation of parole.

Dr. Jean Segall, a psychiatrist, examined defendant in June and July 1998. Dr. Segall diagnosed him as having "major depression with psychotic features" and prescribed medication. Defendant complained of paranoid delusions. Persons with paranoid delusions might do irrational things.

12

Defendant testified again at the penalty phase. He said he had been giving guidance to fellow inmates younger than he to try to minimize the violence. He had made positive contributions to his family and believed he could continue to do so. He expressed sympathy for the families who had lost their loved ones.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. Claims of Evidentiary Error

##### a. Admission of Hearsay Statements

Defendant contends the court erred in admitting two items of hearsay evidence in violation of his right to confront witnesses.

(1) Citing Evidence Code section 1370, the prosecution sought to present a videotape of a police interview with Markius Walker, who had died by the time of trial.[6] Defendant objected. After a hearing, the court overruled the objection and admitted the tape, which was later played to the jury. The statement was taken on January 4, 1999, by Detective Richardson and three other officers in a "gang office" at the Compton Police Department. It concerned the events of October 8, 1998. Walker identified the Cadillac as the car involved in the shooting, described the shooter in a manner consistent with defendant's appearance, and selected defendant's photograph from a lineup as that of the shooter. Defendant never had an opportunity to cross-examine Walker.

---

[6] Evidence Code section 1370, subdivision (a), provides that the hearsay rule does not make inadmissible a statement that "purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant," if the declarant is unavailable as a witness, "[t]he statement was made at or near the time of the infliction or threat of physical injury" and "under circumstances that would indicate its trustworthiness," and was "made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official."

13

Defendant contends admitting the tape violated his right to confront witnesses under the Sixth Amendment to the United States Constitution. He is correct, as United States Supreme Court decisions postdating the trial have made clear.

The Sixth Amendment to the United States Constitution guarantees the accused in criminal prosecutions the right "to be confronted with the witnesses against him." In *Crawford v. Washington* (2004) 541 U.S. 36, the high court held that this provision prohibits the admission of out-of-court *testimonial* statements offered for their truth, unless the declarant testified at trial or was unavailable at trial and the defendant had had a prior opportunity for cross-examination. (See *Davis v. Washington* (2006) 547 U.S. 813, 821; *People v. Cage* (2007) 40 Cal.4th 965, 969.) The *Crawford* rule applies to cases like this, which are still on appeal, even though it was announced after the trial. (*People v. Cage*, *supra*, at p. 974, fn. 4.)

In *Davis v. Washington*, *supra*, 547 U.S. 813, the court explained the difference between testimonial and nontestimonial statements made to the police. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id*. at p. 822; accord, *Michigan v. Bryant* (2011) 562 U.S. __, __ [131 S.Ct. 1143, 1154] [quoting *Davis*].)

The videotaped statement of this case was clearly testimonial for these purposes. Objectively, the circumstances show that the interrogation's primary purpose, indeed, it appears, its only purpose, was to investigate the crime. The

14

statement was taken nearly three months after the October 8, 1998, shooting, long after any emergency had ended. The police questioned Walker intensively about what he saw and when. "[T]he nature of what was asked and answered" showed that the questioning was not necessary to resolve a present emergency but rather designed "to learn . . . what had happened in the past." (*Davis v. Washington*, *supra*, 547 U.S. at p. 827.) The statement was videotaped in an office at the police department. This heightened formality — a "structured, station-house interview" — also shows the purpose of the statement was to collect evidence. (*Michigan v. Bryant*, *supra*, 562 U.S. at p. __ [131 S.Ct. at p. 1166].)

Because the statement was testimonial and defendant had no opportunity to cross-examine Walker, admitting the videotape over his objection violated his federal constitutional right to confront witnesses. This conclusion makes it unnecessary to consider defendant's additional argument that the statement was not admissible under Evidence Code section 1370.

" 'Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24.' [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error." (*People v. Loy* (2011) 52 Cal.4th 46, 69-70.) We conclude the error was harmless beyond a reasonable doubt.

The videotape was cumulative of other evidence. Damien Perry positively identified defendant at trial as the gunman and had previously selected his photograph from a lineup. He also positively identified defendant's distinctive Cadillac as the car involved in the shooting. Antwone Hebrard also selected defendant's photograph from a lineup as the person who had "shot at us," although he repudiated the identification at trial. Moreover, both Perry and Hebrard identified the Cadillac shortly after the shooting. Perhaps more importantly, Chavers and Bombarda, security guards at the New Wilmington Arms apartment

15

complex who knew defendant and his Cadillac well, testified that shortly after the shooting, the Cadillac passed through the guard shack. Chavers testified that defendant was in the front passenger seat, an unusual circumstance, as defendant was usually the driver. After Chavers supplied information to the police that resulted in defendant's Cadillac being impounded, defendant came looking for him, saying, "Where's the fucking cripple," a clear reference to Chavers. As the only White member of the Park Village Crips, defendant was himself distinctive and easy to identify. The videotape the jury viewed added nothing that was not well established by other evidence.

Moreover, the videotape was not emphasized to the jury. Defendant claims the prosecution placed "heavy reliance" on the videotape, but the record does not support the claim. In his opening statement to the jury, the prosecutor briefly mentioned the videotape twice without describing its substance. In his lengthy opening argument to the jury, the prosecutor mentioned some of the videotapes played to the jury, including Walker's, and made a general reference to "Mr. Walker, videotape, Mr. Perry who testified and Mr. Hebrard and Mr. Nunley," without discussing the content of the videotape. He noted without detail that Perry, Walker, and Hebrard had identified both defendant and his car. He also said, "You saw the videotape of Mr. Walker. You have that in evidence, watch it, if it is important to you." The most substantive comment the prosecutor made about the videotape came in his closing argument to the jury, where he referred to "the videotape of Mr. Walker, extremely good recall." The prosecutor never discussed the videotape in any detail and said nothing to distinguish it from the other positive identifications by witnesses who actually testified.

Nothing in the record suggests the videotape was important to the jury or had any effect on its verdict. During deliberations, the jury asked no questions and requested no readback of testimony. Despite the prosecutor's invitation to the jury

16

to "watch it, if it is important to you," the jury did not ask to watch the Walker videotape. The record shows that the error in admitting the videotape was harmless beyond a reasonable doubt.

(2) Compton Police Captain Reginald Wright testified that he transported the three uninjured witnesses to the New Wilmington Arms, where they identified the Cadillac as having been involved in the shooting. Defendant contends that admitting this testimony violated his right to confront witnesses.

The contention is not cognizable on appeal because defendant did not object to the testimony at trial. (*People v. Kennedy* (2005) 36 Cal.4th 595, 611-612.) Defendant contends that because the trial court had overruled his objection to the videotape of Walker's statement, an objection would have been futile. We disagree. The overruling of an objection to one item of evidence does not necessarily mean an objection to different evidence would have been futile. Here, the question of the admissibility of the videotape, which Walker made months after the shooting, was not closely related to Captain Wright's testimony, which recounted that Perry, Hebrard, and Walker had identified the Cadillac shortly after the shooting. With no clear linkage between these two pieces of evidence, defendant could not reasonably have concluded the denial of his motion to exclude the videotape necessarily rendered futile a different motion to exclude Captain Wright's testimony on confrontation or hearsay grounds.

Additionally, even if defendant had objected, we would find either no violation of defendant's right to confront witnesses or no prejudice. Defendant argues first that, because Captain Wright did not name the three who identified the Cadillac, "[t]he witnesses, not even identified, were not available for cross-examination." We disagree. Although Captain Wright did not himself name the three, the record as a whole shows they were the three riding in Perry's car, specifically, Perry, Hebrard, and Walker. No one other than these three and

17

Nunley, the injured victim, were ever mentioned as witnessing the event. Hebrard was not asked about this matter, but both Perry and Walker stated that they had gone to the apartment complex shortly after the shooting and identified the Cadillac. Moreover, Captain Wright testified that he had gone to the scene because the three witnesses were "upset with the police, the patrol officer, in terms of what had happened, what led up to the shooting," and that "they were kind of giving the patrol officers a hard time. So they requested my presence." This testimony obviously referred to the three in Perry's car, who had been forced to walk out of the area after the police impounded the car. If there had been any doubt who the three were, it could have been cleared up by a simple objection, which defendant did not make, or a few questions of the witnesses, which defendant did not ask. Given the state of the record, no reasonable juror would have assumed the three were persons never mentioned at trial, rather than the three uninjured witnesses about which the jury knew.

Both Hebrard and Perry testified at trial, and thus were subject to cross-examination. Accordingly, even assuming their postcrime identifications of the Cadillac were testimonial for confrontation purposes, admitting the evidence did not violate defendant's right to confront those two witnesses. (*Davis v. Washington*, *supra*, 547 U.S. at p. 821; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19.)

Walker stated on the videotape the jury viewed that "Reggie" (obviously Captain Reginald Wright) had taken him to the car that he then identified. Thus, Captain Wright merely repeated what the jury heard Walker himself say. It was undisputed that Walker had identified the car. That the jury heard this from two sources rather than one made the identification no more nor less prejudicial. There was no cumulative prejudicial effect. Accordingly, admitting Captain Wright's

18

testimony regarding Walker was harmless for the same reasons that admitting the tape itself was harmless.

### b. Admission of Out-of-court Statement for a Non-hearsay Purpose

Damien Perry testified that he observed the Cadillac "pulling up to the light on Rosecrans." The prosecutor asked him what happened next. Perry responded, "Somebody had said that that was Goldie and —" Defendant objected "to what somebody else said." The prosecutor argued, "It's not based on the truth of the matter asserted. Explaining what happened next." The court instructed the jury that "this is offered to merely explain conduct. And it is not for the truth of the matter asserted. I'm referring specifically to the statement the witness just said, that someone else made reference to someone named Goldie." The prosecutor then asked Perry, "After someone made that reference, what did you do next?" Perry said that after they observed the Cadillac run a red light, "we ran across the red light and got across the traffic and get [*sic*] my clothes and stuff out the car." Perry did not again refer to someone saying it was "Goldie."

Defendant contends the court erred in permitting Perry to testify that someone had said it was Goldie. As the court explained to the jury, it admitted the statement for the nonhearsay purpose of explaining conduct which, in this context, could only have been meant to explain why Perry and the others ran across the street. This is an example of " 'one important category of nonhearsay evidence — evidence of a declarant's statement that is offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief. The statement is not hearsay, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement.' " (*People v. Scalzi* (1981) 126 Cal.App.3d 901, 907, quoting Jefferson, Cal.

19

Evidence Benchbook (1978 supp.) § 1.5, p. 21; see also *People v. Samuels* (2005) 36 Cal.4th 96, 122 [out-of-court statement properly admitted to explain witness's subsequent actions].)

Defendant contends that Perry's conduct was irrelevant, and the evidence was so prejudicial that the court should have excluded it under Evidence Code section 352. The nonhearsay purpose must be relevant for the statement to be admissible for that purpose. (*People v. Scalzi*, *supra*, 126 Cal.App.4th at p. 907.) "A determination of relevance and undue prejudice lies within the discretion of the trial court, and a reviewing court reviews that determination for abuse of discretion." (*People v. Smith* (2003) 30 Cal.4th 581, 612.) In this case, the fact that the statement was made was not very probative, although it may have been relevant for the jury to understand why Perry and the others ran across the street. The reference to "Goldie" did have some prejudicial effect because the evidence established that defendant went by that name. But under the circumstances, including the court's prompt admonition to the jury, any error in permitting this fleeting reference to the statement was harmless. Substantial other evidence, including Perry's own testimony, established that the Cadillac involved in the shooting belonged to defendant. It is not reasonably probable the verdict would have been more favorable to defendant had Perry not testified that an unidentified person saw Goldie before the shooting. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Defendant claims the prosecutor himself exploited the statement for its truth. He argues, "When the prosecutor cannot distinguish between the purpose for which he introduced testimony and the truth of the matter asserted," the jury cannot be expected to do so. The record does not support the claim. Our review of the prosecutor's opening and closing arguments to the jury has disclosed no

mention of the statement at all, much less a discussion of it for an improper purpose.

The two portions of the record that defendant cites to support his claim do not do so. In his opening statement to the jury, the prosecutor said, "I believe that more — more than one, possibly only one of the people in the car knows this car, knows — knows who is in it, knows it's a Park Village Crips gang member named Goldie." It is not clear what actual evidence later presented, if any, made this point, but the comment, made *before* any evidence had been presented, is not a clear reference to the statement at issue. The court explained to the jury that an opening statement is merely a statement of what the attorney expects the evidence would show and is not evidence itself. This statement was not itself an improper use of evidence that would only later be offered for a limited purpose. Next, defendant cites the following portion of the prosecutor's closing argument to the jury: "What was the opportunity to see and hear? Well, they are at Compton Boulevard, and they see the vehicle there. Some of them do. It's an easily recognizable vehicle with an easily recognizable person who drives the vehicle." This comment did not refer to the statement at issue. It merely noted what evidence properly admitted for its truth established — that both the Cadillac and defendant were easily recognizable. The prosecutor did not exploit the statement at issue for an improper purpose or, so far as we can find, for *any* purpose in his argument to the jury.

Contrary to defendant's argument, permitting this brief mention of the out-of-court statement for a limited nonhearsay purpose did not render the trial fundamentally unfair in violation of his constitutional due process rights. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) For two reasons, the testimony also did not violate defendant's Sixth Amendment right to confront witnesses. First, "there are no confrontation clause restrictions on the introduction of out-of-court

21

statements for *nonhearsay* purposes." (*People v. Cage*, *supra*, 40 Cal.4th at p. 975, fn. 6.)  Second, the statement was clearly nontestimonial for confrontation purposes.  (See pt. II.A.1., a., *ante*.)

### 2. *Claims of Instructional Error*

Defendant contends the court erred in several respects in instructing the jury at the guilt phase.

(1)  The court instructed the jury with the then-standard jury instructions regarding the use of circumstantial evidence generally and as it relates to the required mental state.  It gave two parallel sets of instructions, one regarding the substantive criminal charges and one regarding the special circumstance allegations.  (CALJIC Nos. 2.01 [Sufficiency of Circumstantial Evidence — generally], 2.02 [Sufficiency of Circumstantial Evidence to Prove Specific Intent or Mental State], 8.83 [Special Circumstances — Sufficiency of Circumstantial Evidence — generally], and 8.83.1 [Special Circumstances — Sufficiency of Circumstantial Evidence to Prove Required Mental State].)

As given here, the general instructions stated:  "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only, one, consistent with the theory that the defendant is guilty of the crime, but, two, cannot be reconciled with any other rational conclusion.  *Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt.  In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.*  Also, if the circumstantial evidence as to any particular count permits two reasonable interpretations, one of which points to the defendant's guilt

22

and the other to his innocence, you must adopt that interpretation that points to the defendant's innocence and reject that interpretation that points to his guilt. If, on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." (See CALJIC No. 2.01, italics added; see also CALJIC No. 8.83 [substantially similar instruction concerning the special circumstance allegations].)

The instructions concerning mental state (CALJIC Nos. 2.02, 8.83.1) largely tracked the general instructions, but they did not repeat the italicized language. Defendant contends the instructions regarding mental state had to repeat the italicized language to apprise the jury adequately regarding the reasonable doubt standard. Without repeating that language, he argues, "[n]othing in [CALJIC] Nos. 2.02 and 8.83.1 requires that the facts or circumstances upon which an inference of a required specific intent or mental state rests, be found beyond a reasonable doubt." We disagree. The court also gave the other standard instructions regarding the prosecution's burden to prove guilt beyond a reasonable doubt. As a whole, the instructions made clear that the prosecution had to prove defendant's guilt, including the existence of the required mental states, beyond a reasonable doubt. (See *People v. Maury* (2003) 30 Cal.4th 342, 428-429.)

Defendant further argues that without repeating the italicized language, "[j]urors may instinctively apply the statutory interpretation maxim *expressio unius est exclusio alterius* to the court's instructions," that is, they might believe the italicized language did not apply to the mental state requirement, and thus conclude the reasonable doubt standard did not apply with full force to that requirement. This claim is not cognizable. It is merely a claim that an instruction that is otherwise correct on the law should have been modified to make it clearer. "A party may not argue on appeal that an instruction correct in law was too

23

general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) If defendant had been concerned the jury might draw some invidious inference from the fact that the various instructions did not track each other completely, he should have requested a clarification. He did not do so. (*Id.* at p. 504.)

In any event, we see no reasonable likelihood the jury would have parsed the instructions in such a way as to believe something less than the reasonable doubt standard applied to the mental state requirements. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1013.) As a whole, the instructions were quite clear that the prosecution had the burden of proof beyond a reasonable doubt in all respects. (See *People v. Loy*, *supra*, 52 Cal.4th at pp. 75-76.)

(2) Defendant makes a somewhat similar argument regarding the instructions concerning direct evidence. In addition to the instructions on circumstantial evidence discussed above, the court instructed the jury with CALJIC No. 2.00 (Direct and Circumstantial Evidence — Inferences): "Evidence consists of the testimony of witnesses, writings, material objects, or anything presented to the senses and offered to prove the existence or nonexistence of a fact. [¶] Evidence is either direct or circumstantial. [¶] Direct evidence is evidence that directly proves a fact. It is evidence which by itself, if found to be true, establishes that fact. [¶] Circumstantial evidence is evidence that, if found to be true, proves a fact from which an inference of the existence of another fact may be drawn. [¶] An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence. [¶] It is not necessary that facts be proved by direct evidence. They may be proved also by circumstantial evidence or by a combination of direct and circumstantial evidence. Both direct and circumstantial evidence are acceptable as a means of proof. Neither is entitled to any greater weight than the other."

24

As can be seen, the discussion of direct evidence in CALJIC No. 2.00 is not as detailed as the discussion of circumstantial evidence in CALJIC No. 2.01. Defendant argues that differentiating in this way between direct and circumstantial evidence "diminish[es] the reasonable doubt standard for direct evidence" in violation of various constitutional rights   The claim is not cognizable.  CALJIC No. 2.00 itself correctly states the law.  Defendant merely argues that the instruction should have been modified to make it clearer.  If defendant had been concerned that the jury might misconstrue the instructions, he should have requested they be modified.  He did not do so.  (*People v. Hillhouse*, *supra*, 27 Cal.4th at pp. 503-504.)

Moreover, the argument lacks merit.  A series of Court of Appeal decisions concerning the equivalent CALCRIM instructions have rejected the same contention.  (*People v. Golde* (2008) 163 Cal.App.4th 101, 117-118 [upholding CALCRIM Nos. 223 (Direct and Circumstantial Evidence: Defined), 224 (Circumstantial Evidence: Sufficiency of Evidence), and 225 (Circumstantial Evidence:  Intent or Mental State)]; *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1186-1187 [upholding CALCRIM Nos. 223 and 224]; *People v. Anderson* (2007) 152 Cal.App.4th 919, 929-934 [upholding CALCRIM Nos. 223 and 224]; see also *People v. Smith* (2008) 168 Cal.App.4th 7, 18 [citing *Ibarra* and *Anderson* with approval as having held that CALCRIM Nos. 223 and 224 "correctly state the law regarding direct and circumstantial evidence and do not in any way undermine the reasonable doubt standard or presumption of innocence"].)

We agree with these decisions.  Differentiating between direct and circumstantial evidence does not undermine the reasonable doubt standard or presumption of innocence for the simple reason that direct evidence and circumstantial evidence are different.  "Circumstantial evidence involves a two-step process — first, the parties present evidence and, second, the jury decides

which reasonable inference or inferences, if any, to draw from the evidence — but direct evidence stands on its own. So as to direct evidence no need ever arises to decide if an opposing inference suggests innocence." (*People v. Ibarra*, *supra*, 156 Cal.App.4th at p. 1187; see also *People v. Solomon* (2010) 49 Cal.4th 792, 825-826 [rejecting a somewhat similar challenge to CALJIC Nos. 2.00, 2.01, and 2.02]. )

Defendant correctly notes that federal courts do not have to distinguish between the two types of evidence in instructing the jury. "[T]he federal Constitution itself does not require courts to instruct on the evaluation of circumstantial evidence where . . . the jury properly was instructed on reasonable doubt." (*People v. Rogers* (2006) 39 Cal.4th 826, 886, citing *Holland v. United States* (1954) 348 U.S. 121, 140.) But the United States Supreme Court has never suggested state courts are prohibited from instructing on circumstantial evidence. This court has long held that when the prosecution's case rests substantially on circumstantial evidence, trial courts must give "an instruction embodying the principle that to justify a conviction on circumstantial evidence the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion." (*People v. Yrigoyen* (1955) 45 Cal.2d 46, 49; see *People v. Heishman* (1988) 45 Cal.3d 147, 167.) Fulfilling this duty does not violate the United States Constitution.

(3) The trial court instructed the jury how to evaluate the credibility of witnesses. The main instruction it gave in this regard was CALJIC No. 2.20. As given, this instruction began as follows: "Every person who testifies under oath is a witness. You are the sole judges of the believability of a witness and the weight to be given to the testimony of each witness. [¶] In determining the believability of a witness you may consider anything that has a tendency to prove or disprove

26

the truthfulness of the witness' testimony, including but not limited to the following . . . ." Then followed a list of specific factors for the jury to consider.

At the trial, some out-of-court statements were admitted for their truth including, for example, videotaped statements that witnesses Antwone Hebrard and Kim Grant gave to the police. Regarding this evidence, the court instructed, "Evidence that at some other time a witness made a statement or statements that is or are inconsistent or consistent with his or her testimony in this trial, may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on that former occasion." (See CALJIC No. 2.13.)

Defendant argues the trial court had a sua sponte duty — either by modifying the standard instructions or by giving a separate instruction — to inform the jury that similar principles apply to evaluating the credibility of out-of-court statements introduced for their truth that apply to evaluating the credibility of in-court witnesses. He claims that, without a specific instruction, the jury might not have understood that it should evaluate the credibility of the witnesses' out-of-court statements similarly to the way it was to evaluate their in-court testimony. We disagree. No reasonable jury would interpret these instructions in such a way as to preclude their applying the relevant portions of CALJIC No. 2.20 to their evaluation of all the evidence, including the out-of-court statements. If defendant believed clarifying instructions were necessary to fully inform the jury how to evaluate the evidence, he should have requested them. He did not do so. (*People v. Hillhouse*, *supra*, 27 Cal.4th at pp. 503-504.) Absent the request, we see no reasonable likelihood the jury would have misunderstood the instructions in the way defendant asserts. (*People v. Reliford*, *supra*, 29 Cal.4th at p. 1013.)

(4) Defendant challenges the trial court's instruction regarding motive. The court instructed, "Motive is not an element of the crime charged and need not

27

be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty." (CALJIC No. 2.51.) Defendant argues that the jury might infer from this instruction that motive alone would be sufficient to convict. We have already rejected the contention. "If the challenged instruction somehow suggested that motive alone *was* sufficient to establish guilt, defendant's point might have merit. But in fact the instruction tells the jury that motive is not an element of the crime charged (murder) and need not be shown, which leaves little conceptual room for the idea that motive could establish *all* the elements of murder. When CALJIC No. 2.51 is taken together with the instruction on the concurrence of act and specific intent (CALJIC No. 3.31) and the instruction outlining the elements of murder and requiring each of them to be proved in order to prove the crime (CALJIC No. 8.10), there is no reasonable likelihood [citation] it would be read as suggesting that proof of motive alone may establish guilt of murder." (*People v. Snow* (2003) 30 Cal.4th 43, 97-98.)

Defendant seeks to distinguish *Snow* by noting that the court here also gave CALJIC No. 2.52, which expressly told the jury that evidence of flight is not by itself sufficient to establish guilt. He argues that the failure to so state regarding motive would cause the jury to believe that motive alone *was* enough to convict. In *People v. Cleveland* (2004) 32 Cal.4th 704, 750, the defendant similarly argued "that because the motive instruction, unlike the court's instruction on attempts to suppress evidence, did not specifically say that evidence of motive alone is insufficient to prove guilt, it implied that such evidence alone may be sufficient." What we said in that case applies equally here. "We find this claim not cognizable. This argument merely goes to the clarity of this instruction. 'A party may not argue on appeal that an instruction correct in law was too general or

28

incomplete, and thus needed clarification, without first requesting such clarification at trial.' (*People v. Hillhouse*, *supra*, 27 Cal.4th at p. 503.) If defendants had thought the instruction should be clarified to avoid any implication that motive alone could establish guilt, they should have so requested. They did not. (*Id*. at p. 504.) We also find no error and no prejudice. The court fully instructed the jury on the reasonable doubt standard. We find no reasonable likelihood the jury would infer from the motive instruction that motive alone could establish guilt. Moreover, given the strong evidence of guilt aside from motive, the jury certainly did not base its verdicts solely on motive." (*Cleveland*, *supra*, at p. 750.)

(5) Finally, defendant contends that various instructions "undermined and diluted the requirement of proof beyond a reasonable doubt." Specifically, he challenges CALJIC Nos. 2.01, 2.02, 2.21.2, 2.22, 2.27, 2.90, 8.83, and 8.83.1. We have long rejected these contentions and continue to do so. (*People v. Friend* (2009) 47 Cal.4th 1, 53; *People v. Cleveland*, *supra*, 32 Cal.4th at pp. 750-751; *People v. Snow*, *supra*, 30 Cal.4th at pp. 98-99.) The instructions as a whole made clear to the jury that the prosecution had the burden of proving every element of the charged crimes and special circumstance allegations beyond a reasonable doubt. This is not a complex or difficult concept. There is no reasonable likelihood the jury would have parsed the instructions in such a way as to believe, contrary to what the court expressly informed it, that the prosecution had some lesser burden.

In connection with this instructional claim, defendant asserts the prosecutor committed misconduct by sometimes asking him on cross-examination whether other witnesses were lying in their testimony. Recognizing that this claim is not cognizable on appeal because he failed to object (*People v. Riel* (2000) 22 Cal.4th 1153, 1196-1197), defendant raises this claim only to try to show prejudice from

29

the asserted instructional error. This argument adds nothing to the strength of the instructional claim.

It is difficult to judge the merits of defendant's claim that the prosecutor should not have asked the questions. Had defendant objected, the court might have sustained some of the objections. (See *People v. Chatman* (2006) 38 Cal.4th 344, 377-384.) But deciding whether to object to questions on cross-examination is inherently tactical. "Effective attorneys do not always make an objection merely because it might be successful, even during cross-examination of the client. They might reasonably consider how the client is holding up under the questioning and the jury's reaction to it. Indeed, an attorney might welcome argumentative . . . questions if the client is doing well. The jury might sympathize with or find credible a witness who successfully withstands such questioning." (*People v. Riel*, *supra*, 22 Cal.4th at p. 1197.) Accordingly, we need not analyze the record to determine whether the court would have or should have sustained objections that defendant did not make.

### 3. Sufficiency of the Evidence

Defendant contends the evidence was insufficient to support the true findings that the crimes of October 8, 1998, and January 3, 1999, were committed on behalf of a criminal street gang, and that the murders were committed under the special circumstance of lying in wait.

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have

reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) The same test applies to the review of special circumstantial findings. (*People v. Stevens* (2007) 41 Cal.4th 182, 201.)

### a. The Criminal-street-gang-enhancement Allegation

Section 186.22, subdivision (b)(1), enhances the sentence for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (See *Albillar*, *supra*, 51 Cal.4th at p. 59.) The jury found this enhancement true as to both of the shooting incidents. Defendant contends the evidence was insufficient to support the findings.

It was undisputed that defendant was a member of the Park Village Crips, and that the Park Village Crips was a criminal street gang within the meaning of this statute. But the enhancement applies "only if the crime is 'gang related.' " (*People v. Gardeley* (1996) 14 Cal.4th 605, 622.) "Not every crime committed by gang members is related to a gang." (*Albillar*, *supra*, 51 Cal.4th at p. 60.) Defendant contends the evidence was insufficient to show that the crimes, that is, the shootings of October 8, 1998, and January 3, 1999, were (1) "committed for the benefit of, at the direction of, or in association with" the Park Village Crips, and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Quoting § 186.22, subd. (b)(1).) We will discuss the two shooting incidents in order.

31

(1)  A reasonable jury could have found the October 8, 1998, drive-by shooting of Emmanuel Nunley was gang related.  The evidence showed that all three persons in defendant's Cadillac were members of the Park Village Crips when defendant fired the shots, and that the victim, Nunley, as well as Hebrard and Walker, were members of a rival "Bloods" gang.  Both Perry and Detective Richardson testified that Crips and Bloods gangs do not get along; Perry said there were "fights and shooting" between the gangs.  Perry also testified that "all of us" were wearing red, the color of the Bloods.  Defendant is correct that Perry, Hebrard, and Walker had distanced themselves from Nunley by the time defendant shot Nunley, but this circumstance does not prevent the jury from finding the gang enhancement true.  The jury could reasonably infer that defendant shot Nunley, a rival gang member, for the benefit of, and in association with, his own gang.  Indeed, a drive-by shooting by a gang member of a rival gang member is a prototypical example of a gang-related crime.

Moreover, the evidence also supported the conclusion that defendant specifically intended to promote, further, or assist in that crime.  Contrary to defendant's argument, "the scienter requirement in section 186.22(b)(1) . . . applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*Albillar*, *supra*, 51 Cal.4th at p. 66.)  "[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id*. at p. 68.)  Here there was such substantial evidence.

(2)  A reasonable jury could also have found the shooting of the security guards on January 3, 1999, was gang related, even though none of the guards were themselves gang members.  Defendant's membership in the Crips gang was a

32

major part of his life, as attested to by the many Crips gang tattoos he bore, and the fact that he had already committed a drive-by shooting on behalf of the gang. (See *Albillar*, *supra*, 51 Cal.4th at p. 62 [evidence of gang tattoos supports finding that crime committed with fellow gang members was gang related].) Defendant committed this crime in association with Sanders, the fellow gang member who was with him during the October 8 shooting. Security guards at the guard shack had identified his Cadillac to the police shortly after the October 8 shooting, and evidence showed that defendant was angry at least at Chavers for helping to have his car impounded. Three of the guards on duty at the time of the drive-by shooting were on duty the night of the murders. Evidence showed that the Park Village Crips considered the New Wilmington Arms apartment complex — the complex the security guards were guarding — to be their territory. The complex was covered with gang graffiti. Detective Richardson testified that criminal street gangs have the common goal to "terrorize the public" by committing violent crimes. A reasonable jury could conclude from all this evidence that defendant shot the security guards to enhance the Park Village Crips's reputation, to show that the gang rather than the security guards were in charge of the apartment complex, or to retaliate for the guards' role in identifying his car in the earlier gang-related drive by shooting.

In short, substantial evidence supported the findings that both shootings were gang related. Because of this conclusion, we need not consider defendant's additional argument that vacating the gang enhancements would also require reversing the related convictions.

### b. The Lying-in-wait Special Circumstance

Defendant contends the evidence was insufficient to support the finding that the murders were committed by lying in wait. At the time of the murders,

33

section 190.2, former subdivision (a)(15), made it a special circumstance if the defendant killed the victim "while lying in wait." (Stats. 1995, ch. 478, § 2, p. 3565.)[7] Under this provision, "the elements of the lying-in-wait special circumstance required an intentional killing, committed under circumstances that included a physical concealment or concealment of purpose; a substantial period of watching and waiting for an opportune time to act; and, immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*People v. Stevens*, *supra*, 41 Cal.4th at p. 201, fn. omitted.) The evidence here provides substantial evidence of each of these elements.

The evidence clearly supports a finding that defendant killed intentionally. Indeed, the jury found the defendant premeditated the killing, a finding the evidence strongly supports. Defendant concealed his purpose and, during the time just before the actual shooting, his physical presence until he suddenly appeared at the door of the guard shack and began shooting his victims.

The evidence also showed substantial waiting and watching for an opportune time to act. Defendant's Cadillac was observed the previous evening driving back and forth several times with its headlights off. Around 11 p.m. that evening, defendant and others threatened the guards, and one of them was heard saying to a person in defendant's Cadillac, "We'll do it later." It appears that two of the guards were patrolling the apartment complex around that time and thus were not available as targets. From this evidence, the jury could reasonably infer defendant was seeking, but did not find, an opportune time to act that evening. He

---

[7] In 2000, an initiative approved by the voters changed the word "while" in this subdivision to "by means of." (Prop. 18, approved by the voters at the Mar. 7, 2000, Primary Elec., making effective Stats. 1998, ch. 629, p. 4163; see *People v. Lewis* (2008) 43 Cal.4th 415, 512, fn. 25.)

34

did not find all four guards together in the guard shack with no one else around. It appears that defendant then went to a bar in Los Angeles for a few hours, returning in the early morning hours. That morning, Kim Grant observed defendant enter and leave the complex repeatedly a few minutes before the shooting. When defendant finally did act, around 5 a.m., the four victims were alone in the guard shack. Two were reading the newspaper and two were conversing. This moment, a quiet time in the early morning, with all four victims easy targets, was an extraordinarily opportune time to act. The jury could reasonably infer it was the time for which defendant had been waiting and watching.

Finally, the evidence showed that immediately after this period of waiting and watching, when the time became opportune, defendant made a surprise attack on unsuspecting victims from a position of advantage. Defendant suddenly appeared in the door of the guard shack, said, "Motherfucker," then immediately fired into the shack with a semi-automatic firearm. One of the victims was later found still sitting in a chair with his hands in his pockets. The inference of surprise is inescapable; defendant's victims were entirely unsuspecting. Defendant also attacked from a position of advantage — shooting suddenly with a semi-automatic firearm on victims trapped in a small room reading a newspaper or conversing. This evidence is ample to support the special circumstance.

In arguing to the contrary, defendant relies heavily on *Domino v. Superior Court* (1982) 129 Cal.App.3d 1000, 1011, which held that "the killing must take place during the period of concealment and watchful waiting or the lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends. If a cognizable interruption separates the period of lying in wait from the period during which the killing takes place," the lying-in-wait special circumstance does not apply. We have never definitively decided whether *Domino* correctly interpreted the statute. (See *People v. Lewis*, *supra*, 43 Cal.4th

35

at p. 513.)  Here it does not matter.  The trial court instructed the jury about the *Domino* requirement.  (CALJIC No. 8.81.15 (1989 rev.); see *People v. Lewis*, *supra*, at p. 513.)  Moreover, the evidence easily meets the *Domino* test. Defendant began shooting immediately after he made his presence known.  He fired on his victims immediately after the period of watching and waiting had ended; thus, the shooting flowed continuously from the period of watchful waiting.  There was no cognizable interruption between the lying in wait and the killing.

### 4.  *Validity of the Lying-in-wait Special Circumstance*

Defendant contends that the lying-in-wait special circumstance, both on its face and as applied to him, unconstitutionally fails to provide a meaningful basis for distinguishing between capital and noncapital cases.  We have repeatedly rejected the facial challenge and see no reason to depart from those holdings.  (See *People v. Lewis*, *supra*, 43 Cal.4th at pp. 515-516.)  The as-applied challenge also fails.  "[D]efendant in essence is arguing that the lying-in-wait special circumstance is too broad if the facts of his case fall within it.  That is simply another way to state his facial attack on the statute, which we have rejected above."  (*Id*. at p. 517.)  Here, defendant waited and watched until his victims were all together in a small space and entirely unsuspecting.  He then attacked suddenly, with devastating effect.  Finding a lying-in-wait special circumstance is entirely appropriate.

### B.  Penalty Phase Issues

### 1.  *Evidence of Unadjudicated Criminal Activity*

The prosecution presented evidence in aggravation at the penalty phase that defendant (1) stabbed a fellow jail inmate on October 8, 1999, and (2) was involved in several fistfights in prison in the decade of the 1990's.  (See § 190.3,

factor (b) [permitting trier of fact to consider "[t]he presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."].)  A juror may consider evidence of another crime only if that juror finds the defendant committed it beyond a reasonable doubt.  (*People v. Huggins* (2006) 38 Cal.4th 175, 239; *People v. Robertson* (1982) 33 Cal.3d 21, 53-54.)  Defendant contends this evidence should not have been admitted because, in each instance, the evidence was insufficient for a jury to conclude that he was guilty of a crime involving violence.**8**

The contentions are not cognizable on appeal because defendant failed to object to any of the evidence on this basis at trial.  (*People v. Hamilton* (2009) 45 Cal.4th 863, 934; *People v. Montiel* (1993) 5 Cal.4th 877, 928 & fn. 23.) Defendant claims he is not challenging the *admission* of the evidence but its *sufficiency*, a challenge a defendant may make on appeal from a conviction without an objection.  But, as we explained in *Montiel*, here the evidence was admitted at the penalty phase of a capital trial as aggravating evidence, not to support a conviction for that crime.  "Even if defendant need do nothing at trial to preserve an appellate claim that evidence supporting  his *conviction* is legally insufficient, a different rule is appropriate for evidence presented at the penalty

---

**8**      Defendant also notes that the court did not instruct the jurors on the elements of the crimes.  Because he did not request such instructions, the court had no duty to give them.  "[A]bsent a request, the trial court has no duty to specify the names or elements of the unadjudicated crimes when instructing the jury on factor (b) evidence.  [Citations.]  The premise of this rule is that, for tactical reasons, most defendants prefer not to risk having the jury place undue emphasis on the prior violent crimes."  (*People v. Taylor* (2010) 48 Cal.4th 574, 656.)  Contrary to defendant's contention, the absence of instructions on the elements of the crimes does not strengthen his evidentiary arguments.

phase of a capital trial. There the ultimate issue is the appropriate punishment for the capital crime, and evidence on that issue may *include* one or more other discrete criminal incidents. [Citation.] If the accused thinks evidence on any such discrete crime is too insubstantial for jury consideration, he should be obliged in general terms to object, or to move to exclude or strike the evidence, on that ground. [Citations.]" (*People v. Montiel*, *supra*, at p. 928, fn. 23.)

Defendant argues, "Nowhere does Respondent present authority for the proposition that failure to contest the admission of evidence represents a concession that the evidence supports a finding of guilty beyond a reasonable doubt of uncharged crimes." But we are not finding a concession of any kind; we are merely concluding that defendant forfeited the claim the evidence should not have been admitted on the ground that it was insufficient. Defendant could, and did, argue to the jury that the evidence was insufficient. But, as *People v. Montiel*, *supra*, 5 Cal.4th 877, explains, he cannot argue on appeal the evidence should not even have been admitted without objecting on this ground at trial.

If we were to consider the merits, we would conclude that the evidence regarding the October 8, 1999, incident was sufficient and, therefore, any objection would have lacked merit. The evidence regarding the jail fistfights was presented in a form that was, indeed, subject to an objection if defendant had made one. We do not know why defendant did not object, although the record suggests possible reasons. In any event, defendant cannot show prejudice from his attorney's failure to object.

We will discuss the two types of evidence that defendant challenges.

(1) Deputy Sheriff Alfredo Salazar testified that in the early morning hours of October 8, 1999, he was on duty in module 2600 of the Los Angeles County jail. An inmate, Allen Weatherspoon, approached him and said, "Man down." The inmate had several lacerations on his neck, face, and right hand. Deputy

38

Salazar testified that Weatherspoon "said it was the White guy. He's in Charley 11. He's in Charley 11. We said, 'Who did this to you?' He said, 'White guy. A White Crip.' So my partner then asked him, you know, what did he do it with? He said he did it with a razor blade. He cut my throat." Charley 11 (also called cell 11) was one of the cells in module 2600. A short time later, another deputy sheriff found defendant concealed under a bed in that cell. Defendant was the only White person in that cell, and there were no other White Crips in the entire module. Weatherspoon asserted the privilege against self-incrimination and did not testify. The court did require him, however, to enter the courtroom so the jury could observe his injuries.

Contrary to defendant's argument, the combination of Weatherspoon's injuries, his statements that the "White guy," a "White Crip," had assaulted him with a razor blade, the fact that defendant was the only White Crip in the module and the only White in cell 11, and defendant's having been found concealing himself in that cell "was sufficient to allow a rational trier of fact to determine beyond a reasonable doubt that defendant" had assaulted Weatherspoon. (*People v. Hart* (1999) 20 Cal.4th 546, 650.) An objection on this ground would have lacked merit had defendant made one.[9]

---

[9] Defendant did object at trial to admission of Weatherspoon's hearsay statements. After a hearing, the court overruled the objection, ruling that they were admissible as spontaneous statements under Evidence Code section 1240. Defendant does not contend the court erred in this regard. It appears the court had discretion to find the statements admissible as spontaneous statements, and they were nontestimonial for confrontation clause purposes. (See generally *Michigan v. Bryant*, *supra*, 562 U.S. __ [ 131 S.Ct. 1143] [regarding the confrontation clause]; *People v. Lynch* (2010) 50 Cal.4th 693, 751-752 [regarding spontaneous statements].)

(2) Otto Felske, a custodian of records for the California Department of Corrections, reviewed defendant's prison file and testified that defendant had been disciplined five times between 1991 and 1997 for being involved in fistfights with fellow prison inmates. On none of the occasions was there any suggestion that defendant was armed with a weapon.

Defendant is correct that this evidence does not show that defendant had committed a *crime* rather than merely violated prison rules. "The criminal activity contemplated by Penal Code section 190.3 is conduct that constitutes an offense proscribed by statute." (*People v. Lancaster* (2007) 41 Cal.4th 50, 93.) Being involved in a fistfight, without more, is not necessarily a crime. Moreover, it is not obvious that this evidence would have been admissible under the hearsay rule. Thus, an objection would have been meritorious had defendant made one. We do not know why defense counsel did not object. It is possible he was concerned that a successful objection might merely have caused the prosecution to present evidence of some or all of the fights in a nonobjectionable fashion that might have been more damaging to defendant — i.e., by presenting live witnesses who testified about assaults defendant committed. Having a witness provide sterile testimony from records might be better for the defendant than having actual eyewitnesses testify to what occurred.

Moreover, the record suggests other tactical reasons for not objecting. Counsel was careful to ensure that the prison file that Felske reviewed contained defendant's extensive medical records, which became part of the case in mitigation. In his argument to the jury, counsel noted the absence of proof beyond a reasonable doubt that defendant had committed crimes regarding the fistfights. He argued, "It sounded to me as I heard the evidence that we found about five fist fights among young men similarly aged to Mr. Livingston." He then turned this evidence to defendant's advantage. He noted "there was no suggestion . . . that

40

there was ever a violent act by David against a correctional officer." He argued that "one of the better predictors of how he will do there [in prison] is his past performance while in prison"; and that "we . . . would not suspect attacks on correctional officers or we would have heard about that from the jury stand from the officer from the Department of Corrections."

Thus, defense counsel may have failed to object for tactical reasons. Moreover, defendant has failed to show prejudice. The prosecutor mentioned the fights only fleetingly in both his opening statement and argument to the jury. This evidence paled in significance compared to the remaining evidence in aggravation; that remaining evidence in turned paled in significance compared to the horrendous crimes of which defendant was convicted. Moreover, defense counsel turned the evidence to defendant's advantage by noting that the prosecution presented evidence of fights with inmates, but nothing at all about assaults on correctional officers. Under any standard, the jury's penalty determination did not turn on this testimony from defendant's prison file.

### 2. *Claims of Instructional Error*

Defendant contends the court erred in several respects in instructing the jury at the penalty phase.

(1) Defendant contends the court erred in not repeating CALJIC No. 17.40, a guilt phase instruction that, among other things, says that each juror must consider the evidence to reach a verdict, "if you can do so." He argues that this omission, combined with penalty instructions saying that the jury "must now determine" (CALJIC No. 8.84) and had the "duty to determine" (CALJIC No. 8.88) the appropriate penalty, denied the possibility of a deadlock, in violation of various constitutional rights. He further contends the instructions were

41

"reminiscent of" the instructions used to coerce a verdict that this court condemned in *People v. Gainer* (1977) 19 Cal.3d 835.

The contention is not cognizable. "[D]efendant forfeited any claim with respect to the failure to reinstruct in particular on the respective duties of the judge and jury and the concluding instructions 'by failing to request such instructions at trial.' (*People v. Wilson* (2008) 43 Cal.4th 1, 30.)" (*People v. Ervine* (2009) 47 Cal.4th 745, 804.)

The contention also lacks merit. In general, the court has no duty to repeat CALJIC No. 17.40 at the penalty phase. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 74-75.) Moreover, "[w]hen, as here, there is no jury deadlock as to the appropriate penalty, the court is not required to instruct the jury that it has the choice not to deliver any verdict." (*People v. Miller* (1990) 50 Cal.3d 954, 1009.) The court did not impermissibly coerce a verdict. "No 'dynamite' instruction of the sort condemned in *Gainer* was given here. . . . [The jury] was not instructed that the case 'must at some time be decided.' (Cf. *People v. Gainer*, *supra*, 19 Cal.3d at pp. 841, 851-852.) Nor were minority jurors admonished to reconsider their opinions in light of the fact that the majority had taken the opposite position. (*Id*. at pp. 841, 847-851.)" (*People v. Harris* (1981) 28 Cal.3d 935, 964.) As defendant notes, the *Harris* court also observed that the trial court there had given CALJIC No. 17.40 (*People v. Harris*, *supra*, at p. 964), which was not the case here. But this observation was not critical to *Harris*'s conclusion, and it is not critical here. The important point is that the court gave no remotely coercive instruction.

Defendant also claims a violation of equal protection of the laws because, if two defendants had been tried together at the penalty phase, the court would have instructed the jury that if it reached a verdict as to one defendant but could not agree as to the other, it must render a verdict as to the one on which it did agree.

42

(See CALJIC No. 8.88.) But the two situations are not comparable. Instructing the penalty jury what to do if it reached a verdict as to one defendant but not another would be necessary if there were more than one defendant; it is unnecessary when, as here, there was only one defendant. In neither situation would the court have given an improperly coercive instruction.

(2) The court instructed the jury, "Sympathy for the family of the defendant is not a matter that you may consider in mitigation. Evidence, if any, of the impact of an execution on family members should be disregarded unless it illuminates some positive quality of the defendant's background or character." (See CALJIC No. 8.85.) Defendant argues that, especially when the prosecution is permitted to rely on victim impact evidence, this instruction violated his constitutional right to have the jury consider any mitigating evidence. We disagree. (*People v. Bemore* (2000) 22 Cal.4th 809, 855-856.)

(3) Defendant contends that giving CALJIC No. 8.88 violated various constitutional rights. We have repeatedly rejected many challenges to that instruction. (E.g., *People v. Butler* (2009) 46 Cal.4th 847, 873-875.) Defendant's current argument appears to be slightly different from, but it is no more meritorious than, the many other arguments we have rejected. Defendant focuses on this sentence in CALJIC No. 8.88: "You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." He argues that this sentence "contrasts" moral and sympathetic values and aligns moral values with aggravating factors and limits sympathy to mitigating factors. It does no such thing. It simply refers to both moral and sympathetic values and tells the jury it may consider both regarding *any* of the various factors. (Cf. *People v. Brasure* (2008) 42 Cal.4th 1037, 1065 [defendant argued the trial court erred in *not* giving this sentence from CALJIC No. 8.88].) This claim is also not cognizable. If defendant had been concerned

43

that the jury might somehow have misunderstood the instructions in the way he suggests, he should have requested clarification. He did not do so.

### 3. Cumulative Prejudice

Defendant contends the cumulative effect of the asserted errors was prejudicial. The only cognizable errors we have found were the admission of Walker's videotaped statement and, perhaps, the admission for a nonhearsay purpose of evidence that Perry heard someone say "that was Goldie." Admitting these items of evidence was harmless even in combination. There was no other error to cumulate.

### 4. Challenges to California's Death Penalty Law

Defendant reiterates numerous challenges to California's death penalty law that we have repeatedly rejected. None of the claims are meritorious, and we see no reason to reconsider our previous decisions.

Section 190.3 is not impermissibly broad. (*People v. Schmeck* (2005) 37 Cal.4th 240, 304.) Factor (a) of that section does not permit arbitrary and capricious imposition of the death penalty. (*People v. Schmeck*, *supra*, at p. 304.) Except regarding evidence of other crimes, jurors need not find aggravating factors true beyond a reasonable doubt; no instruction on burden of proof is needed; the jury need not achieve unanimity except for the verdict itself; and written findings are not required. (*People v. Farley* (2009) 46 Cal.4th 1053, 1134; *People v. Mendoza* (2007) 42 Cal.4th 686, 707.) Intercase proportionality review is not required. (*People v. Mendoza*, *supra*, at p. 706.) Use of prior criminal activity in aggravation was proper. (*People v. Hartsch* (2010) 49 Cal.4th 472, 515.) The court need not instruct the jury that statutory mitigating factors are relevant solely in mitigation. (*People v. Mendoza*, *supra*, at p. 708.) The California death penalty scheme does not violate equal protection by treating

44

capital and noncapital defendants differently. (*People v. Farley*, *supra*, at p. 1134.) Use of the death penalty does not violate international law and is not unconstitutional. (*People v. Mendoza*, *supra*, at p. 708.)

### III. CONCLUSION

We affirm the judgment.

**CHIN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CORRIGAN, J.**
**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Livingston

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S090499
**Date Filed:** April 26, 2012

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Jack W. Morgan

_____

**Counsel:**

Robert Wayne Gehring, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Joseph P. Lee and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Robert Wayne Gehring
19091 SW York Street
Beaverton, OR  97006
(503) 848-9068

Daniel C. Chang
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2395