Filed 8/12/14  P. v. Salazar CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048077 |
| v. | (Super. Ct. No. 10CF2716) |
| SAUL JOSE SALAZAR, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Patrick Donahue, Judge.  Affirmed.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Saul Jose Salazar of second degree murder (Pen. Code, § 187, subd. (a); all statutory references are to the Penal Code unless noted) and found he used a knife in committing the crime (§ 12022, subd. (b)(l)). Salazar contends the trial court prejudicially erred by failing to modify the imperfect self-defense instruction so it would apply to the use of excessive force, and not just to force that was lethal. For the reasons expressed below, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

In the 1990's, Lourdes Salazar (Lourdes) met Antonio Verdugo-Cabrera (Verdugo-Cabrera) when he arrived from Tijuana. Lourdes's affection for the younger Verdugo-Cabrera grew and she treated him like a son. In August 2010, Verdugo-Cabrera confided in Lourdes he was having marital problems and his wife refused to let him stay in their home. Lourdes offered to help, and in late August 2010 Verdugo-Cabrera began staying at the three-bedroom two-story apartment Lourdes shared with her son, Salazar, and her daughter, Ashley Espinoza.

In late September 2010, Lourdes rented out one of the two upstairs bedrooms to Shalina Hurtado and Hurtado's grandmother, Madelyn Miller. Lourdes occupied the downstairs bedroom with Espinoza. Salazar sometimes stayed in the second upstairs bedroom. On the night of the murder, however, Lourdes's other daughter, Sarahy Valencia, Valencia's boyfriend, Miguel Batrace, and their baby occupied the second upstairs bedroom. Verdugo-Cabrera slept in Lourdes's bedroom.

Miller and Hurtado suspected Lourdes and Verdugo-Cabrera were having an affair. According to Miller, Salazar did not approve of the relationship. Miller previously heard Salazar mutter, "Kill that son of a bitch, kill that son of a bitch," but Miller did not know to whom Salazar referred. Salazar, extremely religious, also made comments like, "Justice is coming. He's going to kill everybody. We're all going to go down."

2

Lourdes had called the police concerning Salazar's behavior on several occasions. On August 15, 2010, Salazar assaulted Lourdes during an altercation. Police officers arrested Salazar and instructed him not to return to the apartment. On October 1, 2010, Lourdes reported Salazar had thrown lamps and sofas in the apartment because she would not give him money to buy drugs and then took her car without permission.

Around 3:00 a.m. on October 3, 2010, Salazar returned to Lourdes's apartment with several friends. He was under the influence of heroin, yelled and broke things, including the bedroom door, and refused to make his friends leave. Police officers responded and told Salazar they would arrest him if he returned to the apartment.

Salazar testified he returned to the apartment around 6:30 a.m. and fell asleep. Around 9:30 a.m., he awoke and went to the bathroom. He saw Verdugo-Cabrera on the phone in Lourdes's room. He heard Verdugo-Cabrera saying, "Her son this, her son that. Gotta get this piece of shit out of here. He is good for nothing." Salazar confronted Verdugo-Cabrera and told him he should leave the house and return to his family. Approximately one hour later, Verdugo-Cabrera left the apartment.

Juan Arechiga, Verdugo-Cabrera's employer and friend, testified Verdugo-Cabrera phoned him to pick him up from the apartment, explaining he had to leave to avoid problems with Salazar. He mentioned one occasion when he awoke to find Salazar staring at him. He feared Salazar would do something to him someday, such as "put a knife in me while I'm asleep." Later that day, Lourdes told Verdugo-Cabrera to "come on back to the house, we're going to have a barbeque." Verdugo-Cabrera agreed.

According to Salazar, at the barbeque that evening, Verdugo-Cabrera grilled the meat but refused to give Salazar any of the food. Lourdes testified she told Verdugo-Cabrera not to give Salazar any beer. Salazar became angry, and according to Miller, Salazar pointed at Verdugo-Cabrera, and said things like "'Fuck you, fuck this, fuck you,'" and, "'Leave my mother alone,'" "'You're no good for my mom.'"

3

Later that evening, Hurtado and Miller heard a bump or rumble in the bedroom next door. The door opened and one or two people rushed down the stairs. Miller heard Verdugo-Cabrera yelling, "Madelyn, Madelyn" and heard Valencia yell for her to get downstairs. Hurtado and Miller both went downstairs and saw Verdugo-Cabrera on the couch bleeding and gasping for air.

Salazar testified that at around 11:00 p.m., while he was on the couch in the living room, Valencia told him he could stay in the upstairs bedroom that night. Salazar went up to the room, closed the door, locked it, and then laid on the bed. When he got up to empty his pockets, Verdugo-Cabrera opened the door, entered the bedroom, and walked toward Salazar with a knife in his hand. Salazar pushed Verdugo-Cabrera, went for the knife, and tried to remove it from him. He grabbed Verdugo-Cabrera's hand with his left hand and the knife with his right hand. He removed the knife and took control of it. As this happened, Verdugo-Cabrera punched Salazar in the back of the head with his left hand. Salazar got up, stood face to face with Verdugo-Cabrera, and stabbed him in the chest. Just before Salazar stabbed Verdugo-Cabrera, Verdugo-Cabrera was no longer coming after him. Salazar only remembered stabbing Verdugo-Cabrera one time. Verdugo-Cabrera stepped back and Salazar ran past him out of the room.

Salazar went downstairs to the living room and no one was there. Verdugo-Cabrera came down behind him and was having trouble breathing. Lourdes, Batrace, and Valencia came out of Lourdes's room. Salazar saw Batrace run into the kitchen and open a drawer. Salazar was confused about what Batrace was going to do, and believed Batrace was either going to chase him with a knife or give Verdugo-Cabrera a knife. Batrace and Salazar did not get along.

Salazar fled the residence and hid in the bushes. Around 2:40 a.m., while police were conducting their investigation, Salazar returned to the apartment. Detective Jim Garcia asked Salazar his name and Salazar responded, "Jose Gonzales." Officer Daniel Park asked Salazar if he had any weapons, and Salazar admitted he had a knife in

4

his left pocket.  Salazar did not tell officers that he used the knife in self-defense.  Later, a detective told Salazar that Verdugo-Cabrera was dead.  Salazar replied, "'That sucks.'"  Asked why he stabbed Verdugo-Cabrera and whether Verdugo-Cabrera was beating him up, Salazar responded, "'Next question.'"  Asked the reason behind the stabbing, Salazar asked detectives for "categories of reasons."  Salazar testified he accidentally spit water at the detective's face during the interview and did not remember singing songs in response to questions.  Salazar never provided any details about what led to the stabbing.

Salazar testified he never saw the pocketknife before he saw Verdugo-Cabrera holding it the day of the stabbing.  Salazar denied it was his knife or that he ever had a pocketknife.  But, Miller testified she previously had seen Salazar flicking the same pocketknife used to stab Verdugo-Cabrera, and saw him use it to clean his nails.  Miller, Batrace, and Arechiga never saw Verdugo-Cabrera with a knife.  Arechiga added that at work they used utility blades, not knives.  In 2009, Sergeant Phil Craft made contact with Salazar and found a knife with a four-inch blade in his rear pocket.

Verdugo-Cabrera suffered three stab wounds; two on his left arm and one fatal wound in his left chest.  Salazar suffered bruising and scratching on his right shoulder blade and right forearm, abrasions on his right hand, and a laceration requiring sutures on his palm.  A forensic pathologist testified the bruising, scratches, and abrasions were nonspecific injuries and could have occurred from hiding in the bushes.  A homicide detective testified it is common to find a self-inflicted wound on the stabber's palm because blood causes the knife to become slippery.

In November 2012, a jury convicted Salazar as noted above.  In February 2013, the trial court imposed a term of 15 years to life for the murder and one year for the knife enhancement.

DISCUSSION

A.  *Pitchess Motion*

Salazar filed a pretrial discovery motion seeking the personnel records of Santa Ana Officer Isaac Ibarra, who responded to the apartment after the stabbing. (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531; Evid. Code, § 1043 et seq.; § 832.5, 832.7, 832.8.)  Salazar complained Ibarra fabricated events surrounding Ibarra's arrival at the apartment, and therefore sought documents reflecting the officer's lack of credibility or prior acts of moral turpitude.  After examining the personnel records in camera, the trial court denied Salazar's discovery motion.

Salazar asks us to independently review the transcript of the in camera *Pitchess* proceeding and the documents submitted to the court to determine whether the court complied with the requisite procedures described in *People v. Mooc* (2001) 26 Cal.4th 1216 (*Mooc*).

We have reviewed the sealed reporter's transcript of the *Pitchess* hearing conducted on September 21, 2012.  The trial court placed under oath the Santa Ana Police Department's custodian of records, John Corby, and questioned him about how the Santa Ana Police Department maintained its files.  Corby disclosed Santa Ana generally maintains a personnel file (application and hiring records, commendation letters, performance evaluations) and an internal affairs file (discipline).  Corby represented neither file contained anything "based on untruthfulness about this officer."  The trial court reviewed the personnel file and noted it contained fitness reports, performance evaluations, schooling certificates, and training information.  The court remarked it saw "absolutely nothing in here that pertains to what's at issue" and "nothing in there to even duplicate.  Nothing even close to duplicating."  Corby also represented there was nothing discoverable in the internal affairs files.  The court reviewed the files and concluded there were no citizen complaints about false police reports and nothing "in here that pertains to

what we're looking for." Corby agreed that "if a person doesn't have any complaints about lying or anything like that, you wouldn't even create a file for that." Corby stated he searched "everywhere" and "there's just no file on that because there's just been no reports on it," and he noted if an officer allegedly falsified a police report or lied, "[w]e would conduct an investigation; henceforth, a file would be created and then a file would be maintained." There was "no file." The court stated "I've gone through all of these and, you know, I don't see anything in here that pertains to the honesty and credibility issue. So based on everything that I've looked at and based on my questioning of the custodian of record, I just don't think there's any – nothing at all to turn over, nor has there ever been."

The trial court described on the record the files it examined before ruling on the *Pitchess* motion. Based on the court's representations there was "nothing at all to turn over," we discern no need to review the personnel files the court described and examined in camera. (*People v. Myles* (2012) 53 Cal.4th 1181, 1209 [trial court's description of the records it reviewed "is adequate for purposes of conducting a meaningful appellate review"].) The court did not abuse its discretion by denying Salazar's *Pitchess* motion.

B. *The Trial Court Had No Sua Sponte Duty to Instruct on Excessive Force Used in Imperfect Self-Defense*

The trial court instructed the jury on first and second degree murder (CALCRIM No. 520), self-defense (CALCRIM No. 505), and voluntary manslaughter based on imperfect or unreasonable self-defense (CALCRIM No. 571) and heat of passion (CALCRIM No. 570). In closing argument Salazar argued for self-defense, but also urged the jury to consider imperfect self-defense, presumably because lawful self-defense permits the victim to use only the force reasonably necessary to repel an attack. (See *People v. Pinholster* (1992) 1 Cal.4th 865, 966.) This seemed a prudent course

7

since Salazar conceded in his testimony that Verdugo-Cabrera no longer was "coming after" him when Salazar stabbed him in the chest.

The trial court read to the jury the following instruction on imperfect self-defense: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed the person because he acted in imperfect self-defense. [¶] If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense if: [¶] 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] And [¶] 2. *The defendant actually believed that the immediate use of deadly force was necessary* to defend against the danger; [¶] But [¶] 3. At least one of those beliefs was unreasonable." (Emphasis added.)

Thus, the instruction makes clear imperfect self-defense applies when a defendant honestly but unreasonably believed deadly force was necessary to defend against a deadly attack. Salazar complains the trial court should have modified the instruction sua sponte so it would apply also to the use of excessive force, and not just to force that was deadly. Salazar therefore reasons the standard imperfect self-defense instruction is defective because it fails to "inform a jury it may find a defendant acted without malice by using excessive force if the defendant honestly but unreasonably believed the degree of force was necessary."

Under the doctrine of imperfect self-defense, the use of deadly force is by definition excessive because the defendant resorted to lethal force in the unreasonable belief deadly force was necessary to defend against the danger. We therefore assume Salazar's argument is based on the distinction between deadly force and nonlethal excessive force, such as a shove or slap that results in death.

8

The short answer to Salazar's argument is that he would not be entitled to such an instruction even if we accepted his notion the imperfect self-defense instruction should include a reference to excessive force. Assuming his distinction between deadly and excessive force exists where the force employed results in a death, Salazar would still fall short in establishing the factual predicate necessary for the court to give his proposed instruction. There simply was no evidence Salazar used anything but deadly force when he stabbed Verdugo-Cabrera in the chest. Assuming Salazar acted in imperfect self-defense, the force he used in killing Verdugo-Cabrera was both deadly and excessive.

We also conclude CALCRIM No. 571 accurately states the law and therefore reject Salazar's distinction between excessive and lethal force. Under the imperfect self-defense instruction, the jury would have returned a voluntary manslaughter verdict if it found Salazar actually but unreasonably believed he was in imminent danger of being killed or suffering great bodily injury, whether or not he used deadly or nonlethal force to defend himself. The jury's second degree murder verdict shows it rejected this option. Salazar, however, argues the jury could have concluded Salazar reasonably believed he had to defend himself from an imminent deadly attack but harbored malice because he used excessive but nondeadly force rather than the deadly force referred to in the imperfect self-defense instruction. But the use of *any* force in self-defense would be justified if a defendant reasonably believed he was in imminent danger of being killed or suffering great bodily injury.

Salazar's argument, taken to its logical conclusion, would result in an acquittal, not a second degree murder conviction. The trial court instructed the jury a defendant acts in lawful self-defense (1) if the defendant reasonably believes there was an imminent danger of being killed; (2) the immediate use of force was necessary to defend against that danger; and (3) the defendant used no more force than was reasonably necessary to defend against that danger. Thus, if Salazar reasonably believed he was in imminent danger of a deadly attack, but responded with nondeadly force that resulted in

9

the death of his attacker, the jury would have found he acted without malice and in justifiable self-defense.

Salazar's complaint that the imperfect self-defense instruction should have included a reference to excessive force is therefore without merit. Assuming again Salazar uses the phrase "excessive force" to mean nondeadly force, then only two interpretations of the jury's verdict are available under the court's jury instructions, neither of which aid him. If the jury found Salazar actually but unreasonably believed he was in imminent danger of a deadly attack, it would have rejected the prosecution's murder theory and returned a voluntary manslaughter verdict, regardless whether Salazar used deadly or nondeadly force. The amount of force resulting in the victim's death has no bearing on the decision if the jury believed Salazar actually but unreasonably feared an imminent deadly attack by the victim. Because the jury returned a murder conviction, it necessarily rejected Salazar's claim he actually but unreasonably believed he was in danger of being killed or suffering great bodily injury.

Salazar focuses on the second possible interpretation: the jury found Salazar reasonably believed in the need for self-defense from a deadly attack but, "unreasonably used more force than was necessary." This is the concept of excessive but nondeadly force that Salazar argues should have been included in the imperfect self-defense instruction. Salazar surmises its omission resulted in the jury returning a second degree murder conviction instead of the manslaughter verdict he would have received had the court explained the use of nondeadly excessive force qualifies for imperfect self-defense. Salazar's argument, however, makes little sense because a defendant who honestly and reasonably believes there was an imminent danger of being killed or suffering great bodily injury and uses deadly force to respond acts in perfect self-defense. In other words, it is impossible for a defendant to "unreasonably use[] more force than necessary" if the jury has found the defendant reasonably and honestly assessed the need for self-defense from a deadly attack. The jury would have acquitted Salazar had it found

10

he honestly and reasonably believed he faced an imminent, deadly attack, and responded with nondeadly force.

We therefore reject Salazar's contention CALCRIM No. 571 misled the jury into returning a murder conviction because the instruction omitted a reference to nonlethal excessive force. Contrary to Salazar's claim, the failure to include a reference to excessive force in CALCRIM No. 571 did not create the possibility of an erroneous finding of malice. Indeed, referring to excessive force in the imperfect self-defense instruction would only confuse the jury because excessive force has no bearing on an imperfect self-defense claim. The trial court therefore properly instructed the jury excessive force defeated a perfect self-defense claim, but omitted in the imperfect self-defense instruction any similar reference because it did not apply. We presume the jury understood the court's instructions as a whole and correctly applied them. (*People v. Carey* (2007) 41 Cal.4th 109, 130; *People v. Holt* (1997) 15 Cal.4th 619, 644.)

### III

### DISPOSITION

The judgment is affirmed.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


FYBEL, J.


11