Filed 3/23/21  P. v. Kelly CA2/1
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ROBERT KELLY, JR.,<br><br>     Defendant and Appellant. | B302843<br><br>(Los Angeles County<br>Super. Ct. No. YA097127) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alan B. Honeycutt, Judge.  Affirmed as modified.

Lynette Gladd Moore, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield, and Michael C. Keller, Deputy Attorneys General for Plaintiff and Respondent.

———————————————

A jury convicted defendant Robert Kelly, Jr., of one count of failing to perform a duty after an accident in violation of Vehicle Code[1] section 20002, subdivision (a), a misdemeanor. The court placed him on informal probation for three years.

Defendant contends that the court erroneously failed to instruct the jury as to the defense of necessity and that a recent amendment to Penal Code section 1203a, which limits misdemeanor probation to a maximum of one year, should apply retroactively to his case. He also requests that we review the record of an in camera hearing held pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

We hold that the court did not err in failing to give a necessity defense instruction and agree with defendant that the reduction of the maximum probation term applies to him, and modify the judgment accordingly. We have reviewed the sealed record of the *Pitchess* hearing and find no error.

### FACTUAL SUMMARY

#### A. Prosecution Case

On the evening of September 14, 2017, O.G., M.G., and their 12-year-old son (collectively the Garcias) were in the drive-through lane of a fast food restaurant where they ordered food. O.G. was driving and her husband, M.G. was in the backseat.

Defendant pulled in behind the Garcias and ordered food. He moved forward and "tapped" the Garcias' car with his car. M.G. got out of the car, looked at the rear of the car, saw no

---

[1] Subsequent unspecified statutory references are to the Vehicle Code.

damage, waved to defendant and told him "it was okay," and returned to his car.

After the vehicle in front of the Garcias moved up in the line, the Garcias moved forward. O.G. and M.G. got out of the Garcias' car together to see if there was damage, saw none, and M.G. again indicated to the defendant that "it's okay."

Defendant then began honking his car horn and yelling profanities and racial slurs at the Garcias.[2] They returned to the car and O.G. called the police. Defendant continued to yell at the Garcias.

The Garcias moved up to the pickup window. While they waited for their food, defendant accelerated his car and "slammed" into the Garcias' car, damaging the Garcias' bumper. A manager of the restaurant came outside to see what was happening and O.G. called the police again.

M.G. got out of the car and checked on the damage to his car's bumper. He looked at defendant and said, "[W]hy did you do this?" Defendant continued to yell profanities and racial slurs at the Garcias. M.G. then walked to the front of the restaurant, where he spoke with the restaurant's manager. O.G. and her son continued to wait in the car.

Los Angeles County Sheriff's Deputy Maribel Alvarado arrived and asked O.G. and her son to get out of their car. They did, and joined M.G. near the front of the restaurant.

Deputy Alvarado approached defendant, who was still honking his horn. Defendant told Deputy Alvarado that he was tired of waiting and wanted to leave. The deputy told him that the vehicle ahead of him was not finished at the pickup window,

---

[2] The Garcias are Hispanic; defendant is Caucasian.

3

so he could not leave. Defendant told Deputy Alvarado: "I don't care. They won't move. I just want to go." The deputy then asked defendant if he had hit the Garcias' vehicle; he said he did not and that he wanted to leave. After Deputy Alvarado asked defendant if he had been drinking or was on medication, defendant became agitated and aggressive. The deputy then called for backup.

When defendant began to look around inside his vehicle and reach for something, Deputy Alvarado asked him to get out of his car. Defendant refused and yelled at the deputy that she would "have to make [him] get out of the car."

According to O.G. and M.G., defendant pulled Deputy Alvarado toward him and hit the deputy in the face and chest. Deputy Alvarado, however, testified that defendant did not pull her into the car or hit her, but rather that she had reached into the car to try to open the door and defendant swatted her hand away.

O.G., believing that defendant was hitting Deputy Alvarado, told M.G. to help the deputy. M.G. then ran to defendant's car and hit defendant in the face with his hand. Deputy Alvarado told M.G. to go away and not get involved.

While Deputy Alvarado was reaching into the vehicle to open the door, defendant began driving in reverse, out of the drive-through lane. Around that time, another deputy, Deputy Mario Gomez, arrived. After backing out of the drive-through lane, defendant drove through the parking lot and over a curb-framed planter as the deputies drew their firearms and yelled at him to stop. Defendant continued to drive out of the parking lot, nearly hitting the officers, and sped away into the

4

street.  Deputies Alvarado, Gomez, and a third deputy, Deputy Jorge Ortiz, apprehended defendant a short time later.

## B.      Defense Case

Defendant testified as follows.

Defendant is disabled and has "difficult mobility issues." He must use crutches, a walker, or a wheelchair as a result of hip and knee replacement surgeries and broken wrists.  He is "constantly . . . in pain," which makes him irritable at times.

By the time defendant entered the drive-through lane at the restaurant on the night of the incident, defendant had had "a long day," was feeling stressed because of "personal family issues," and experiencing physical pain.

From the time he ordered his food until the altercation started, 10 or 15 minutes elapsed.  Defendant "became a bit irritable" and he honked his horn a couple of times.  M.G. then got out of the Garcias' car and walked towards defendant's car. Defendant wondered why M.G. was looking at the rear bumper on the Garcias' car, because defendant had not bumped the car. M.G. appeared to be "a little agitated," and raised his hands as if to gesture, "what's up?," and called defendant an "asshole." They both then cursed at each other, but defendant did not use any racial slurs.

The second time M.G. got out of his car, O.G. came with him.  Defendant felt confused and had no idea why "people are getting out of their cars at a drive[-]through."  M.G. told defendant that he hit their vehicle, and defendant responded, "I never touched your vehicle."

The situation "escalated" and people in the car behind defendant were talking about dragging him out of the car and making a citizen's arrest.  Someone got out of that car and

5

walked toward him. He now had "people coming towards [him] in the front and people approaching [him] from the rear."

M.G. went to stand outside his car by the pickup window, while the Garcias' car remained in front of him, blocking his forward movement. By that time, defendant had become "a bit irritated" and "want[ed] to leave" and "go home." "Curse words were exchanged."

When Deputy Alvarado arrived and questioned him, he explained that he did not "know what is going on" or "why they're accusing [him]?" He told Deputy Alvarado he was tired, he wanted his food, and he wanted to go home. Because of his disabilities and the limited space between his car and the wall adjacent to the drive-through lane, it would have been very difficult for him to get out of his car.

While Deputy Alvarado stood outside defendant's car, M.G. approached and punched defendant on the left side of his face. When Deputy Alvarado did nothing to detain or restrain M.G., defendant believed he could not trust the deputy "to do her job" or ask her for help. Meanwhile, the car that was behind him had left, allowing him to back out. He "wanted to get out of there, so [he] didn't get hurt anymore." He began backing up because he had "no other way out."

He did not grab or pull on Deputy Alvarado or punch her. He merely pushed or swatted her hand away because he was putting his car in reverse and did not want her to get hurt.

After backing out of the drive-through lane, defendant rolled up his windows and drove through the parking lot. As he drove through the lot, he saw the car that had previously been behind him in the drive-through lane with the occupants who had threatened to drag him out of his car, and the car appeared

6

to be driving at him or trying to cut him off.  He felt that he "was in real danger" and was "afraid for [his] life."

Defendant has prescription eyeglasses for wearing while driving at night, but was not wearing them as he drove through the parking lot.  And although he ordinarily wears a hearing aid, he was not wearing it that night because the batteries were dead.  He had his radio turned on.  He did not hear any officer say anything to him, and he did not attempt to drive at or hit the deputies.

The defense also introduced testimony from several witnesses who testified as to defendant's reputation in the community for honesty, nonviolence, and an absence of racist beliefs or racial bias.

### C.    Procedural History

In April 2018, defendant was charged by information with:  two counts of assaulting police officers (Deputies Alvarado and Gomez) with a deadly weapon and with force likely to produce great bodily injury (Pen. Code, § 245, subd. (c)); one count of assault with a deadly weapon (a car) upon the occupants of the Garcias' car (Pen. Code, § 245, subd. (a)(1); and one count of failing to perform a duty after an accident (§ 20002, subd. (a)), a misdemeanor.

In November 2018, defendant filed a motion for the disclosure of "police personnel records" concerning Deputies Alvarado, Gomez, and Ortiz, pursuant to *Pitchess*, *supra*, 11 Cal.3d 531.  Specifically, he requested that the court "conduct an in camera review of the *Pitchess* material; and provide counsel with the discovery to which he is entitled under the law."  Based on defendant's allegations that the officers used excessive force in apprehending him, the court granted the

7

request for in camera review of the requested personnel files. The court conducted that review on February 20, 2019, with a custodian of records for the Los Angeles County Sheriff's Department. At the conclusion of the hearing, the court sealed the transcript and ordered certain records be disclosed to defense counsel.

On October 15, 2019, a jury found defendant not guilty of the felony assault charges and found him guilty of failing to perform a duty after an accident.

The court suspended the imposition of sentence and placed defendant on informal summary probation for 36 months subject to conditions that he serve 90 days in jail and attend anger management courses. The court also imposed certain statutory assessments and a restitution fine.

## DISCUSSION

### A. Necessity Defense

Defendant contends that the court erred by denying his request to instruct the jury as to the defense of necessity. We reject the contention.

A trial court must instruct "on any affirmative defense for which the record contains substantial evidence [citation]— evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory of the case [citation]. In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.) Our

8

review is de novo. (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1424.)

" 'The necessity defense is very limited and depends on the lack of a legal alternative to committing the crime. It excuses criminal conduct if it is justified by a need to avoid an imminent peril and there is no time to resort to the legal authorities or such resort would be futile.' " (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1164 (*Verlinde*).) " 'To justify an instruction on the defense of necessity, a defendant must present evidence sufficient to establish that [he or] she violated the law (1) to prevent a significant and imminent evil, (2) with no reasonable legal alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief that the criminal act was necessary to prevent the greater harm, (5) with such belief being objectively reasonable, and (6) under circumstances in which [he or] she did not substantially contribute to the emergency.' " (*Id.* at pp. 1164–1165; see also CALCRIM No. 3403.)

The law defendant violated is section 20002, subdivision (a), which provides in relevant part: "The driver of any vehicle involved in an accident resulting only in damage to any property, including vehicles, shall immediately stop the vehicle at the nearest location that will not impede traffic or otherwise jeopardize the safety of other motorists. . . . The driver shall also immediately do either of the following: [¶] (1) Locate and notify the owner or person in charge of that property of the name and address of the driver and owner of the vehicle involved . . . [or] [¶] (2) Leave in a conspicuous place on the vehicle or other property damaged a written notice giving the name and address of the driver and of the owner

9

of the vehicle involved and a statement of the circumstances thereof . . . ."

Even if we assume, as defendant contends, that we should only consider whether his ultimate flight from the scene is the act that constituted a violation of section 20002, subdivision (a), undisputed evidence establishes that he contributed to the creation of the emergency he sought to prevent by such flight. He yelled and cursed at the Garcias, evoking their call to the police, failed to cooperate with Deputy Alvarado's investigation, resisted her efforts to open the defendant's car door, and backed out of the drive-through lane in defiance of the deputy's directions. If he had acted appropriately in the drive-through lane, cooperated with Deputy Alvarado, and complied with the deputy's requests, the peril he believed he needed to avoid by fleeing the scene would not have arisen. (See *Verlinde, supra*, 100 Cal.App.4th at p. 1165 [court properly refused to instruct on necessity defense where the defendant's "own behavior substantially contributed to the emergency"]; see also *In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1330 [person may not delay a police officer's investigation by defying the officer's lawful directions].)

Accordingly, the court did not err in denying defendant's request to instruct the jury on the defense of necessity.

## B.   *Pitchess* Review

In *Pitchess,* our Supreme Court created a mechanism for criminal defendants to discover relevant evidence contained in confidential law enforcement personnel records. (*Pitchess, supra*, 11 Cal.3d at pp. 536–540; *People v. Mooc* (2001) 26 Cal.4th 1216, 1225−1226 (*Mooc*).)  The procedures are now

codified in Evidence Code sections 1043 through 1047 and Penal Code sections 832.5, 832.7, and 832.8.

A defendant seeking discovery must file a motion supported by an affidavit showing good cause for the disclosure sought. (*Mooc*, *supra*, 26 Cal.4th at p. 1226.) If good cause is shown, the court must conduct an in camera hearing to determine what information, if any, must be disclosed. (*People v. Gaines* (2009) 46 Cal.4th 172, 179; Evid. Code, § 1043, subd. (b)(3).)

During the in camera hearing, the custodian of the personnel records must produce "all 'potentially relevant' documents to permit the trial court to examine them for itself." (*Mooc*, *supra*, 26 Cal.4th at pp. 1228–1229.) The trial court must review the documents and disclose to the defendant " 'such information [that] is relevant to the subject matter involved in the pending litigation.' [Citation.]" (*Id.* at p. 1226.) To ensure meaningful appellate review, the trial court must "make a record of what documents it examined before ruling on the *Pitchess* motion." (*Id.* at p. 1229.) We review that record to determine whether the court's rulings as to the information disclosed and not disclosed constitute an abuse of discretion. (*People v. Myles* (2012) 53 Cal.4th 1181, 1209 (*Myles*); *People v. Jackson* (1996) 13 Cal.4th 1164, 1220.)

Here, as noted above, the court held an in camera hearing to review the personnel records concerning Deputies Alvarado, Gomez, and Ortiz. As a result of that hearing, the court ordered that certain information be disclosed to defense counsel.

In response to defendant's request, we have reviewed the sealed record of the in camera hearing and conclude the

trial court properly conducted the hearing and did not abuse its discretion in ordering the disclosure of certain information to defense counsel and declining to disclose other material. (*Myles, supra*, 53 Cal.4th at p. 1209; *Mooc, supra*, 26 Cal.4th at pp. 1228, 1232.)

### C.     Retroactive Application of Assembly Bill No. 1950

As of the date of defendant's sentencing in November 2019, the maximum probation term for his crime was three years. (Pen. Code, former § 1203a.) The court placed him on probation for the maximum term.

In 2020, while defendant's appeal was pending, the Legislature enacted Assembly Bill No. 1950 (2019–2020 Reg. Sess.), which amended Penal Code section 1203a to provide that, subject to an exception not applicable here, the maximum probation term for a misdemeanor is one year. (Stats. 2020, ch. 328, § 1, p. 3757.) The amendment became effective January 1, 2021. (Cal. Const., art. IV, § 8, subd. (c)(1); *People v. Burton* (2020) 58 Cal.App.5th Supp. 1, 12 (*Burton*).)

Defendant contends that he should receive the benefit of the new one-year limitation on probation pursuant to retroactivity principles established under *In re Estrada* (1965) 63 Cal.2d 740, and its progeny. We agree.

The question whether the lower term limits for probation in Assembly Bill No. 1950 should be given retroactive effect has been addressed in three recent published cases, *People v. Sims* (2021) 59 Cal.App.5th 943, 955–964, *People v. Quinn* (2021) 59 Cal.App.5th 874, 879–885, and *Burton, supra*, 58 Cal.App.5th Supp. at pp. 12–19. In each case, the court held that the ameliorative reduction in the maximum length of

12

probation should be given retroactive effect and applied to cases that are not yet final.  (*People v. Sims*, *supra*, at p. 964; *People v. Quinn*, *supra*, at p. 885; *Burton*, *supra*, at pp. 18–19.)  We agree with the reasoning of these cases and likewise hold that, because defendant's case is not yet final, Assembly Bill No. 1950's reduction of the maximum term of misdemeanor probation to one year applies to this case.

## DISPOSITION

The term of defendant's probation is reduced from three years to one year.  The trial court is directed to issue a minute order reflecting this change in the term of probation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

BENDIX, J.

FEDERMAN, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.