Filed 6/7/24  P. v. Calderon CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B322373 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA156679–01) |
| v. | |
| MARIO EMERSON CALDERON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  John A. Torribio, Judge.  Affirmed as modified.

Katharine E. Greenbaum, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Scott A. Taryle and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Mario Emerson Calderon appeals from his judgment of conviction of one count of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1); count 1) and three counts of second degree robbery (§ 211; counts 2–4).  On appeal, Calderon argues (1) the trial court erred in denying his two pretrial motions for substitution of counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), and (2) the abstract of judgment incorrectly identifies the offense in count 2.  We conclude the trial court did not abuse its discretion in denying the *Marsden* motions because it conducted an adequate inquiry into Calderon's claims about his counsel, and Calderon failed to show inadequate representation or an irreconcilable conflict.  We modify the abstract of judgment to correct the error in count 2, but otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Evidence at trial

#### A. July 28, 2021 assault at Target

On July 28, 2021, Elijah Lloyd was working as a security guard at a Target store in Pico Rivera.  Lloyd observed Calderon load two canopies into a shopping cart and then attempt to leave the store without paying for the items.  When Lloyd approached Calderon near the exit, he identified himself as a security guard, grabbed the cart of canopies, and asked Calderon to leave the merchandise inside the store.  Calderon refused, and repeatedly told Lloyd to let go of the cart.  Calderon reached out his arm, and stabbed Lloyd in the chest with a sharp metal object that looked like a box cutter.  Calderon then walked out of store while

---

[1]     Unless otherwise stated, all further undesignated statutory references are to the Penal Code.

pointing at his own chest near the area where he stabbed Lloyd. When Lloyd looked down at his chest, he saw that he had a hole in his shirt and was bleeding. Lloyd sought treatment at a hospital later that day, and missed work for the next two weeks.

At trial, Lloyd testified about the July 28, 2021 incident, including the injury that he sustained from Calderon. The jury saw surveillance video footage of the altercation, along with photographs that Lloyd took of his injury.

### B. August 6, 2021 robbery at Lowe's

On August 6, 2021, Jonathan Leon was working as a cashier at a Lowe's store in Pico Rivera. When Leon saw Calderon leaving the store with a shopping cart full of canopies, he approached Calderon and asked to verify his receipt. As Calderon continued walking away with the cart, he pulled out a box cutter and threatened to stab Leon. Calderon then loaded the canopies into a parked car. Fearing for his life, Leon did not try to stop Calderon from leaving, but he took photographs of the car and its license plate.

At trial, Leon testified about the August 6, 2021 incident. The jury saw surveillance video of the theft and the photographs that Leon took of Calderon's car. The video showed Leon talking to Calderon as he left the store with the canopies, but did not capture Calderon threatening Leon with a weapon.

### C. August 16, 2021 robbery at Lowe's

On August 16, 2021, Angie Campos was working as a cashier at the same Lowe's store in Pico Rivera. Campos noticed Calderon walking out the store with a cart of canopies. Because she had not seen him pay for the items, Campos asked Calderon for a receipt. When Calderon did not respond, Campos followed him outside. After exiting the store, Calderon turned back

3

toward Campos and lifted his shirt, exposing a rectangular-shaped object that resembled a box cutter holster. Campos was fearful, and went back inside to report the incident.

At trial, Campos testified about the August 16, 2021 incident, and the jury saw surveillance video of the theft. The video showed Calderon exiting the store with the cart of canopies, but did not capture his encounter with Campos outside the store.

### D. August 28, 2021 robbery at Lowe's

On August 28, 2021, both Leon and Campos again saw Calderon leaving the Lowe's store in Pico Rivera with a shopping cart of canopies. When Leon asked for a receipt, Calderon replied in an aggressive manner, "Do you want to go?" Calderon also reached his hand toward his waistband, but did not show Leon any weapon. Calderon then walked to the parking lot and loaded the canopies into the same car that Leon had seen before. Leon watched Calderon from the store exit but did not pursue him because of their prior encounter. While the August 28, 2021 incident was not captured on surveillance video, both Leon and Campos testified about the incident at trial.

### E. Police investigation

The detective investigating the robberies reviewed the surveillance video footage from the Target and Lowe's stores, as well as the photographs that Leon took of the suspect's car. In September 2021, the detective observed Calderon entering that car, which was parked across the street from a residence. When the detective executed a search warrant on the residence a few days later, Calderon was present in the home, and the car was parked nearby. During the search, no canopies or box cutters were found inside the residence or the car.

## II.    Jury verdict and sentencing

At the conclusion of the trial, the jury found Calderon guilty as charged of one count of assault with a deadly weapon and three counts of second degree robbery.  The trial court sentenced Calderon to a total term of four years in state prison.

Calderon filed a timely appeal.

## DISCUSSION

## I.    Denial of the *Marsden* motions

Calderon contends the trial court prejudicially erred in denying his two pretrial *Marsden* motions, because it did not conduct an adequate inquiry into the reasons why Calderon was requesting the substitution of appointed counsel.  On this record, we conclude Calderon has failed to establish *Marsden* error.

### A.    *Marsden* proceedings

#### 1.    December 8, 2021 motion

On December 8, 2021, six months prior to trial, Calderon's appointed counsel, James Neptune, informed the trial court that Calderon wanted to make a *Marsden* motion.  Outside the presence of the prosecutor, the court held a *Marsden* hearing on Calderon's request.  At the start of the hearing, Calderon told the court, "I would like my discovery, the medical records of the alleged injured victim and to see the store videos of all of this where Mr. Neptune hasn't provided me.  He said he was going to send me my copies and show me.  He hasn't done anything, in fact, three months that he's been representing me.  I would like to postpone my date to another date with a different public defender, if that's possible."

In response, Neptune stated he had "a redacted copy of [Calderon's] discovery right here."  After confirming with Neptune that all necessary redactions to the discovery had been

made, the court told Calderon, "That has been done, and he has just handed it to the deputy to make sure the redactions are in order, and you'll receive a copy of it."

The court then asked Calderon about his second complaint. Calderon replied he wanted a different attorney because he and Neptune had "a conflict of interest in [his] case." The court inquired what the conflict of interest was, and Calderon answered that Neptune was "pressuring [him] on something" that he did not believe was necessary. When asked to elaborate, Calderon stated that every time he saw his attorney, Neptune would tell him that he "would get a better deal," but he never did. Calderon added, "I don't think he's actually doing anything in my behalf for my case."

The court explained to Calderon that, because he was charged with assault with a deadly weapon along with three counts of robbery, it would be "extremely difficult" for him to receive a favorable plea offer. The court also noted that, a few weeks earlier, Calderon rejected the prosecution's early disposition offer, which is "generally as good as it gets." The court told Calderon, "And when that offer is rejected, they usually don't reoffer the same offer. It usually goes up." Calderon indicated that he understood.

The court next allowed Neptune to respond to Calderon's complaint about a plea deal. As described by Neptune, the prosecution's early disposition offer required Calderon to plead to each count, which was "not a very good offer." The prosecutor later proposed a plea deal of five years for one strike or three years for two strikes. After Calderon rejected both offers, the case proceeded to a preliminary hearing, and the court held Calderon to answer on all counts. Calderon told Neptune that he

6

did not believe the prosecutor had sufficient evidence for a conviction.  Although Neptune expressed to Calderon that the eyewitnesses' testimony would be sufficient to convict him regardless of whether each incident was fully captured on video, Calderon maintained he did not threaten anyone.  Neptune further explained to the court that, earlier that day, he proposed a plea deal of three years for one strike, but the prosecutor rejected his offer.

Calderon disagreed about the terms of the prosecution's last offer, noting that Neptune told him it was "four years for one strike."  Calderon then stated, "I really would like to roll my dice on this and get somebody else."

After listening to Calderon, the court responded, "So here's the thing, what you have said is, basically, he's not fighting for you.  He hasn't given you a better deal.  So what I heard is there was, essentially, an offer made for a plea to all counts and your attorney said, no, that's ridiculous.  That's not a good deal.  Don't take it.  I'm not going to advise you to take that deal.  So you saying he's not fighting for you is rejected by the fact he could have just said, yeah, go ahead.  Take, you know, plead to all counts."

At that point, Calderon attempted to interrupt the court, asserting, "The first deal that was offered—."  The court, however, continued, "Just listen.  So your attorney said, that's not a great deal.  Let's see what happens at prelim.  At prelim, they made you another offer and you rejected that offer.  And they actually brought in live witnesses and the judge said, you know what, I think there's enough there for a jury to decide on his guilt or innocence and you were held to answer."  The court told Calderon, "So your attorney is doing his job.  Even as of

today, he even asked the D.A. for a lower offer, . . . and she said no."

The court concluded the hearing, stating, "[Y]our attorney is doing exactly what he is required to do and that is get in there and fight for you. That's exactly what he's doing. He just turned over discovery, the redacted portion of the discovery, you now have. The court is going to deny your request to have Mr. Neptune relieved."

### 2. April 27, 2022 motion

On April 27, 2022, two weeks before trial, Calderon made a second *Marsden* motion. In response to Calderon's request, the court again held a *Marsden* hearing outside the presence of the prosecutor. Calderon told the court, "So far I asked for my discovery, and Mr. Neptune, all he did was just provide me with paperwork. . . . [H]e hasn't gotten for me injury report or any evidence against me with the box cutter. [¶] Also, he hasn't shown me any videos. So . . . I don't feel like he's capable of representing me 'cause he hasn't shown me no discovery of my file. He wants me to get convicted of something I did not do."

The court asked Neptune whether the evidence sought by Calderon existed. Neptune replied, "Yes, Your Honor. I provided Mr. Calderon with what discovery I'm able to per the sheriff department policies. I'm not able to give him audio disks or D.V.D[s]." Upon further inquiry, Neptune confirmed Calderon had not seen any video footage, and offered to set up his computer to show Calderon the videos he obtained in discovery. The court advised Neptune that, with the bailiff's assistance, he could show the videos to Calderon in the courtroom that day.

The court then asked Calderon what else he believed his attorney had not done. Calderon responded that he had not seen

8

the medical report or photographs of the alleged assault victim. Neptune confirmed he had the victim's medical record and photographs of his injury on disks. The court noted that the victim's medical record was private information, but that Neptune could show Calderon the photographs of the victim's injury when he showed him the videos.

After the court advised Calderon that it would make sure he saw all the discovery that day, Calderon stated that he still wanted another attorney. Calderon told the court, "In nine months I don't feel Mr. Neptune has been working for me." When the court asked for more specific information, Calderon answered, "He's strong with his tricks. He sees me as a convict. He didn't see my innocence. I'm innocent until proven guilty, but this he just pushes, pushes, pushes me to sign . . . a deal that I know I'm not guilty of. That's why I don't want him to represent me, not even if I see the videos, I still don't want him to represent me. I don't care if I come back [in] nine months, I don't mind, but I do not want him to represent me anymore. Thank you."

In response, Neptune stated, "Now, I think Mr. Calderon is under the misapprehension when I conveyed offers to him that I'm somehow preparing him to take a deal. That is not correct. If Mr. Calderon . . . does not want to accept the offers, then we do the trial. That's how it is. That's what I do; but the fact that I convey offers to him, okay, and the fact that I let him know that I don't think his chances at trial are very good based on what I've seen of the case, that doesn't mean that I'm pressuring him to take a deal. I'm simply being realistic with Mr. Calderon. [¶] So if he didn't like my assessment of his case, that's fine, but that's not a reason to remove me from the case."

The court explained to Calderon that his attorney had an obligation to provide him with an honest assessment of his case and to convey any plea offers made by the prosecution. The court also noted that his attorney was "only doing his job" in "telling [Calderon] those things [that] he must." The court denied the second *Marsden* motion, stating, "So at this point in time it's denied subject to the videos being shown . . . . Medical reports are privileged and only the attorney can see them, not anybody else . . . . [¶] He can go over them with you and explain them to you, but you can't have them in your possession."

Later that afternoon, in open court, the trial court asked Neptune whether he was able to show the discovery to Calderon. Neptune replied that he was able to show Calderon the video of the Target incident, but he could not access the videos of the other incidents or the photographs of the victim's injury due to network connection issue. Neptune also stated that he would be reviewing the victim's medical report with Calderon before he left court that day, and would print out the photographs for him by the next court hearing. The prosecutor confirmed that the other videos showed Calderon leaving the store with the merchandise, but did not capture him making any threats. Calderon did not object or raise any other concerns about his counsel with the trial court.

### B. Governing law

Under *Marsden* and its progeny, when a defendant seeks substitution of appointed counsel, " ' "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that

10

defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' " (*People v. Ng* (2022) 13 Cal.5th 448, 500.) " 'A trial court should grant a defendant's *Marsden* motion only when the defendant has made "a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation." ' " (*People v. Streeter* (2012) 54 Cal.4th 205, 230.)

" 'Once a defendant is afforded an opportunity to state his or her reasons for seeking to discharge an appointed attorney, the decision whether or not to grant a motion for substitution of counsel lies within the discretion of the trial judge.' " (*People v. Myles* (2012) 53 Cal.4th 1181, 1207.) We review the denial of a defendant's *Marsden* motion for abuse of discretion. (*People v. Ng, supra*, 13 Cal.5th at p. 500.) " 'Denial is not an abuse of discretion "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." ' " (*Ibid.*)

### C. The trial court did not abuse its discretion in denying Calderon's two *Marsden* motions

Calderon argues the trial court erred by failing to conduct an adequate inquiry at each of the *Marsden* hearings. Calderon asserts that, at the first hearing, the court did not allow him to fully explain why he was seeking another attorney, and at the second hearing, the court did not adequately inquire into why his attorney had not provided access to the video and photographic evidence. We conclude Calderon's claims lack merit.

In *Marsden*, our Supreme Court held that a trial court that "denies a motion for substitution of attorneys solely on the basis of [its] courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of [its]

11

discretion to determine the competency of the attorney." (*People v. Marsden*, *supra*, 2 Cal.3d at p. 124.)  Accordingly, " '[w]hen a defendant moves for substitution of appointed counsel, the court must consider any specific examples of counsel's inadequate representation that the defendant wishes to enumerate.' " (*People v. Hines* (1997) 15 Cal.4th 997, 1024.)  In this case, the record reflects that the trial court made a proper inquiry into Calderon's two requests for substitution of counsel, and acted within its broad discretion in denying each request.

At the first *Marsden* hearing, the trial court gave Calderon ample opportunity to articulate his reasons for wanting to replace Neptune.  Calderon raised two complaints about his counsel at that time.  He first claimed Neptune had not provided him with copies of the discovery, including the assault victim's medical records and the store surveillance videos.  In response to this claim, Neptune told the court he had a "redacted copy of [the] discovery right here," and would give it to Calderon.  Because Calderon would be receiving the redacted copy of his discovery that same day, the court turned to his second complaint.  Calderon next claimed he had a "conflict of interest" with his counsel because Neptune had not obtained a "better deal" for Calderon despite assurances that he would do so.  The court informed Calderon that a more favorable plea deal might not be possible given the serious charges against him.  After Calderon stated that he understood, the court allowed Neptune to respond to this complaint.  Neptune recounted the plea offers made by the prosecutor and Calderon's reasons for rejecting them.  Neptune also noted that he had advised Calderon that the prosecution likely had sufficient evidence for a conviction based on the eyewitnesses' testimony.  Neptune added that, while he

12

continued to seek a favorable plea deal, the prosecutor rejected his most recent offer, and Calderon wanted to proceed with the trial.  As our Supreme Court has observed, " ' "[t]actical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.' " ' "  (*People v. Myles*, *supra*, 53 Cal.4th at p. 1207.)

Calderon claims that, at the first hearing, the trial court improperly cut him off when he tried to further explain why he wanted to replace his attorney.  The record, however, does not support this claim.  The court allowed Calderon to fully explain his reasons for requesting the substitution of counsel, and asked him to elaborate when he stated that they had a "conflict of interest" and Neptune was "pressuring [him] on something."  The court then listened to Calderon's complaint regarding his counsel's failure to obtain a "better deal," and asked Neptune to respond to that complaint.  After Neptune detailed the specific plea offers made by the prosecutor and the reasons that a deal had not been reached, the court informed Calderon why his complaint did not warrant the substitution of counsel.  At one point, Calderon tried to interrupt the court with a comment about the "first deal that was offered."  While the court did not allow that interruption, the record shows it did permit Calderon to "explain the basis of his contention and to relate specific instances of inadequate performance."  (*People v. Ng*, *supra*, 13 Cal.5th at p. 500.)  The court thus conducted an adequate inquiry at the first *Marsden* hearing, and reasonably could conclude that Calderon failed to show either inadequate representation or an irreconcilable conflict with his counsel.

At the second *Marsden* hearing, the trial court again allowed Calderon to explain why he was dissatisfied with his

13

counsel's performance, and then questioned Neptune about each claim.  Calderon complained that Neptune still had not provided him with all of the discovery, and identified three items he had not seen:  (1) the store surveillance videos; (2) the photographs of the assault victim's injury; and (3) the assault victim's medical record.  While Neptune confirmed this evidence existed, he explained that he could not provide it to Calderon "per the sheriff department policies," and he had given Calderon the discovery that was allowed.  In an effort to address Calderon's complaint, the court instructed Neptune to show Calderon the video and photographic evidence that same day, and to review the victim's medical record with him.  The court also made its courtroom facilities available to Neptune for this purpose.  After addressing the discovery issue, the court inquired whether Calderon had any other concerns about his counsel.  The court listened to Calderon's complaint that Neptune was pushing him to "sign a deal" because he believed Calderon was guilty, and to Neptune's response that he was complying with his obligation to convey all plea offers and to provide an honest assessment of the case.  Neptune denied he ever pressured Calderon to accept a plea, and explained that he was "simply being realistic" about his chances at trial.  To the extent there was a credibility question between Calderon and his counsel at the *Marsden* hearing, the court was " ' "entitled to accept counsel's explanation." ' " (*People v. Rices* (2017) 4 Cal.5th 49, 69.)

Calderon contends that, at the second hearing, the trial court committed *Marsden* error because it never asked Neptune why he had not shown the video and photographic evidence to Calderon earlier, or asked Calderon why he wanted to view these materials.  We disagree.  At the second hearing, the court took

14

active steps to ensure that Calderon was given access to each requested item that same day, and stated that it was denying the *Marsden* motion subject to counsel showing Calderon such evidence. Later that day, the court asked Neptune whether he was able to share the materials with Calderon. Neptune stated that, due to technical difficulties, he could only show Calderon the video from the Target assault, and that he would share the assault victim's photos and medical report with Calderon by the next hearing date. Calderon did not object to this proposal, nor did he raise any other complaints about Neptune's performance following the second *Marsden* hearing. Moreover, in considering Calderon's complaints about his lack of access to the discovery, the question before the trial court was not whether Neptune could have shared such evidence with Calderon earlier in the case, but whether the failure to do so demonstrated that counsel's performance "was so deficient that constitutionally ineffective representation was likely to result." (*People v. Wright* (2021) 12 Cal.5th 419, 441.) After hearing at length from both Calderon and Neptune, the court reasonably could find that Calderon failed to make the requisite showing.

On this record, we conclude the trial court conducted a proper inquiry into each of Calderon's requests for substitution of counsel, and did not abuse its discretion in denying the two *Marsden* motions.

## II. Abstract of judgment

Calderon contends, and the People concede, that the abstract of judgment incorrectly states that Calderon was convicted of first degree robbery in count 2. It is undisputed that, in count 2, Calderon was charged with and convicted of second

15

degree robbery, not first degree robbery.  The abstract of judgment must be modified accordingly.

## DISPOSITION

The judgment is modified to reflect that the conviction in count 2 is for second degree robbery.  As modified, the judgment is affirmed.  The superior court is directed to prepare an amended abstract of judgment, and to forward a certified copy to the Department of Corrections.


VIRAMONTES, J.


WE CONCUR:



GRIMES, Acting P. J.



WILEY, J.


16